In the Matter of EXTRADITION of Ferdinand Gino LANG.

No. CV 95–5468 ER.

United States District Court, C.D. California.

Nov. 20, 1995.

Nora M. Manella, U.S. Attorney and Patricia Davies, Asst. U.S. Atty., Los Angeles, CA, for Petitioner.

Maria Stratton, Fed. Pub. Defender and Korey House, Deputy Fed. Pub. Defender, Los Angeles, CA, for Respondent.

MEMORANDUM OPINION AND ORDER DENYING PETITIONER'S REQUEST FOR A STAY, MOTION FOR RELEASE ON BAIL, AND PETITION FOR A WRIT OF HABEAS CORPUS

RAFEEDIE, District Judge:

*Introduction*

Petitioner Ferdinand Gino Lang seeks a stay of extradition to Switzerland pending

resolution of *Lobue v. Christopher*, 893 F.Supp. 65 (D.D.C.1995), in which a district court ruled that the extradition statute, 18 U.S.C. § 3184, was unconstitutional. Lang has also moved to be released on bail pending resolution of *Lobue* on appeal, and finally, he has petitioned for collateral review of the extradition hearing under 28 U.S.C. § 2255, through which he challenges the magistrate judge's finding that he was a fugitive, thereby tolling the statute of limitations.

The Court has read and considered the original and supplemental papers filed in support of and in opposition to Lang's motions, and heard and considered oral argument, and for the reasons that follow, the Court DENIES the request for a stay, the motion for release on bail, and the petition for a writ of habeas corpus.[1]

### Background Facts

Petitioner Ferdinand Gino Lang is currently in federal custody, awaiting extradition to Switzerland for the crime of embezzlement. While employed as an accountant in Zurich, Switzerland, he allegedly stole from his employer by: (1) falsifying invoices in inflated amounts and diverting the excess funds to himself; (2) forging payment authorization for personal debts or straight payments to himself; and (3) reprogramming computer records so as to inflate his monthly salary. In all, Lang allegedly stole approximately Fr. 648,831.45 through over 90 illegal acts between March 1983, and August 1984.

Swiss authorities confronted him in August 1984, and conducted a series of interviews with him between that time and October 1984. On October 19, 1984, Lang was released on his own recognizance without having been charged with a crime. On April 30, 1985, Lang informed Swiss authorities that he was visiting the Netherlands. At the time he left, he was told that he would be expected at another interview set for May 22, 1985.

While purportedly visiting the Netherlands, Lang came to the United States and never returned to Switzerland for the May 22, 1985, hearing. In late 1986, Swiss authorities learned that Lang was residing in the United States and began formal proceedings to extradite him. However, Lang remained at large until he was arrested in Los Angeles on February 15, 1995. Apparently, the U.S. Marshal's Office had received an anonymous tip, divulging Lang's whereabouts and his status as a wanted person.

On June 5, 1995, a magistrate judge certified Lang as extraditable, pursuant to the United States' extradition statute, codified at 18 U.S.C. § 3181 *et seq.* The magistrate judge also made a finding that Lang was a fugitive from justice. This finding tolled the statute of limitations on Lang's crime, pursuant to 18 U.S.C. § 3290.[2]

On August 31, 1995, a district court for the District of Columbia issued an order staying the extradition proceedings in an unrelated case, *Lobue v. Christopher*, 893 F.Supp. 65 (D.D.C.1995), on the ground that the extradition statute violated the separation of powers doctrine. On September 15, 1995, that district court issued an order certifying as a class "all persons who presently are or in the future will be under threat of extradition...." It further stayed extradition of all class members.

The Court of Appeals for the District of Columbia Circuit then lifted the district court's stay pending appeal. The case has been calendared for oral argument in January, 1996, and Lang is presently extraditable.

### Discussion

Lang has raised three issues for consideration, and the Court will deal with these in order. First, he asks for a stay of extradition until *Lobue* is resolved on appeal. Second, in view of the fact that final resolution of *Lobue* could take a significant amount of time,[3] Lang has moved that he be released on bail. Finally, Lang has petitioned under

---

1. The motion for the stay and for bail were originally calendared on October 30, 1995. At that hearing, the Court raised the issue of standing *sua sponte,* and Lang's counsel requested additional time in which to brief the issue. The Court heard the motions and petition again on November 13, 1995.

2. The federal statute of limitations is five years for noncapital offenses. 18 U.S.C. § 3282.

3. *Lobue* is set for oral argument in the Court of Appeals for the D.C. Circuit in January 1996.

28 U.S.C. § 2255, challenging the magistrate judge's determination that he was a fugitive.

## I. Stay of Extradition

### A. Standard for a Stay

■ In order to obtain a stay of extradition, Lang must demonstrate: (1) a probability of success on the merits and irreparable injury; and (2) that serious legal questions are raised and the balance of hardships tip in his favor. *Artukovic v. Rison,* 784 F.2d 1354, 1355–56 (9th Cir.1986).

Lang's request is based on the *Lobue* opinion. If *Lobue* is affirmed by the Court of Appeals, and the stay on extraditing class members is reinstated, then Lang might be entitled to some relief.[4] An analysis of *Lobue* is therefore necessary in order to determine the probability of success on the merits. For the reasons that follow, the Court believes that *Lobue* was decided incorrectly, because it failed to address the threshold issue of whether the plaintiffs in that case actually had standing to challenge the statute.[5]

### B. Grounds for the District Court's Decision in Lobue

*Lobue* concluded that the extradition statute, 18 U.S.C. § 3184, is unconstitutional because it allows for executive revision of judicial determinations of law. *Lobue v. Christopher,* 893 F.Supp. 65, 68 (D.D.C.1995).

■ The extradition statute directs a judicial officer to make a determination of the legality of extradition in every case where extradition is sought. The purpose of this review is to ensure that there is probable cause to believe that the defendant committed the accused act, that the charged criminal offense satisfies "dual criminality,"[6] and that the extradition is otherwise legal. Upon a positive determination, the judicial officer is directed to certify the defendant as extraditable and to turn over a copy of the court testimony to the Secretary of State. 18 U.S.C. § 3184.[7]

■ The constitutional issue arises from the fact that the judicial officer must turn over a copy of the testimony. The *Lobue* court saw this requirement as investing in the Executive Branch the ability to overturn the judicial officer's legal determination. Consistent with the Constitution, the Secretary of State can decline to extradite a defendant for any discretionary reason, or for no reason, but not because he thought the judicial officer's determination of extraditability was legally erroneous. Yet, this revision is what the statute seems to allow. The *Lobue* court saw no other reason for turning over the testimony, except to allow the Secretary of State to review and revise the legal grounds for the decision. *Lobue,* 893 F.Supp. at 68.

In an old line of cases, the Supreme Court has struck down statutes that give either the Executive Branch or the Legislative Branch

---

**4.** As will be discussed later, it is doubtful that Lang would receive any actual benefit beyond delay in extradition. See pages 29–32.

**5.** This case presents an unusual procedural posture. Since Lang has not challenged 18 U.S.C. § 3184 directly, but relies instead on *Lobue,* the Court's standing analysis will focus on the *Lobue* plaintiffs, rather than Lang.

**6.** Under dual criminality, "no offense is extraditable unless it describes conduct which is criminal in both jurisdictions." *Oen Yin–Choy v. Robinson,* 858 F.2d 1400, 1404 (9th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989).

**7.** 18 U.S.C. § 3184 states in relevant part:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, . . . may,

upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. . . . If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

the ability to revise judicial determinations of law. *Gordon v. United States,* 69 U.S. (2 Wall.) 561, 17 L.Ed. 921 (1865);[8] *United States v. Ferreira,* 54 U.S. (13 How.) 40, 14 L.Ed. 40 (1852); *Hayburn's Case,* 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792).

*Hayburn's Case* is perhaps the closest analogy to this situation. In *Hayburn's Case,* federal judges were to certify Revolutionary War veterans as being eligible or ineligible to receive pensions. After the judges sent a list of individuals they believed to be eligible, the Secretary of State would go though the list and make his own determination of eligibility. The Court was prepared to strike down this statute on the ground that neither the Legislature nor the Executive branch was entitled "to sit as a court of errors on the judicial acts or opinions of this court." *Id.* at 410 n. 2.[9]

The Court is not convinced that the extradition statute creates executive revision. Revision is not made part of the extradition scheme explicitly, as was the revision in *Hayburn's Case.* Nor is revision necessarily structural, as it was in *Glidden v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), when Congress' appropriation powers under the Constitution gave it the ability to refuse to authorize payments determined by the judiciary. Indeed, the Court notes that the requirement that testimony be turned over to the Secretary of State would allow that official to determine whether to exercise the discretion afforded to him by numerous extradition treaties.[10] Treaty of Extradition, Feb. 22, 1899, U.S.–Mex., art. IV, 31 Stat. 1818, 1822, T.S. No. 242; Convention Between the United States and the Argentine Republic, Sept. 26, 1896, U.S.–Arg., art. III, 31 Stat. 1883, 1886, T.S. No. 6; Treaty Between the United States and the Empire of Japan, April 29, 1886, U.S.–Jap., art. VII, 24 Stat. 1015, 1017, T.S. No. 191.

Nevertheless, it is not necessary for the Court to reach the merits of *Lobue,* because the Court believes that the plaintiffs in *Lobue* lack standing to challenge the extradition statute.

*C. Standing*

 Standing is a threshold inquiry that derives from the Article III "Case or Controversy" requirement. In the absence of a plaintiff with standing, a federal court lacks subject-matter jurisdiction to hear cases. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Standing consists of three elements: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) redressability. *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136; *Wright,* 468 U.S. at 751, 104 S.Ct. at 3324.

 Although a plaintiff who is the subject of government action typically has standing, in this case, the alleged illegality of action (executive revision) does not appear to cause him any harm.

*1. Injury in Fact*

 An injury in fact is the "invasion of a legally-protected interest which is (a) concrete and particularized; and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (citations omitted). In the case of these defendants facing extradition, the harm stems from extradition under an unconstitutional statute, whereby the executive branch is able to revise judicial determinations of law.

---

8. *Superseded by statute as stated in United States v. Mitchell,* 463 U.S. 206, 213 n. 12, 103 S.Ct. 2961, 2966 n. 12, 77 L.Ed.2d 580 (1983).

9. As it was, Congress repealed the statute, mooting the case. Nevertheless, *Hayburn's Case* continues to have precedential value.

10. Actually, it is possible that the Secretary of State would want as much information as possible concerning the circumstances of the crime and of the extradition so as to exercise his or her discretionary judgment whether to extradite. In other words, if the underlying crime is covered by the extradition treaty, but is petty in nature and remote in time, the Secretary might opt not to extradite despite the legality of doing so.

However, *Lobue* provides historical support for its position in the form of an opinion by the Solicitor General and a Senate Report, both from the 1880s when the extradition statute was passed. *See Lobue,* 893 F.Supp. at 68–69 (citing 17 U.S. Op. Att'y Gen. 184, 185 (1881), and S.Rep. No. 82, 47th Cong., 1st Sess. 3 (1882)).

However, this revision occurs, if at all, only if the Article III judge or magistrate judge *certifies* the accused as extraditable. At that point, the judicial officer turns over the testimony that he heard in reaching the decision. When this occurs, the Secretary of State may decide not to extradite despite the judicial officer's determination of extraditability.

■ On the other hand, if the judicial officer *refuses* to certify the defendant as extraditable, the Secretary of State cannot reverse that decision. Section 3184 makes no provision for the judicial officer to turn over the testimony if he declines to certify the extraditee as extraditable. *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir.) ("The government cannot take a direct appeal from the magistrate's decision *not* to certify the case.") (emphasis in original), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).[11]

Thus, review by the Secretary of State works only to the benefit of extraditees, never to their harm. It serves as a second chance for them to be determined not extraditable. In other words, any potential unconstitutionality in the statutory scheme occurs *after* the extraditee has been determined to be legally extraditable. The extraditees therefore suffer no injury or harm from the unconstitutionality of the statute.

In response, Lang asserts four different injuries to support standing for the *Lobue* plaintiffs. He claims that: (1) the magistrate judge and this Court lack subject-matter jurisdiction because any rulings issued are advisory only; (2) the executive revision denies him the right to appellate review of an extradition order; (3) there is no accountability of the decisionmakers; and (4) the potential unconstitutionality of the statute provides sufficient standing.

### a. Advisory Opinions

■ Lang first claims that the extradition statute is defective in that it allows the judicial branch to render advisory opinions. The prohibition on advisory opinions is almost as old as the Constitution itself. In Correspondence of the Justices (1793), Secretary of State Thomas Jefferson sent a letter to the Supreme Court, seeking answers to a number of legal questions concerning the constitutionality of contemplated foreign policy decisions. The Supreme Court declined to answer Jefferson's questions for three reasons. First, such answers would be premature in light of the fact that the legal issue might actually come before the Supreme Court later. Second, the issues were hypothetical and abstract. Third, there would not be a proper adversarial presentation.[12]

Lang relies on *Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911), to argue that the extradition statute creates advisory opinions. In *Muskrat*, the Court refused to hear a suit set up by Congress as a test case to determine the constitutionality of prior legislation regarding the transfer of Cherokee property from tribal to private ownership. The Court observed that:

> The object [of the lawsuit was] not to assert a property right against the Government, or to demand compensation for alleged wrongs because of action upon its part. The whole purpose of the law is to determine the constitutional validity of this class of legislation, in a suit not arising between parties concerning a property right necessarily involved in the decision in question ... Such judgment will not conclude private parties, when actual litigation brings to the court the question of the constitutionality of such legislation. In a legal sense the judgment could not be exe-

---

**11.** A similar example is found in 1978, when the United States extradited a person to Australia to stand trial. The magistrate judge did not certify the person as extraditable on all charges, however, as there was insufficient evidence for some of the charges. Australia sought permission from the Secretary of State to try the person on the quashed charges. The Secretary wrote back:

> Whereas the Secretary may have authority to the extent consistent with the treaty to refuse to surrender a fugitive located in the United States who has been found extraditable, the

Secretary does not have the power to grant to a foreign government the authority to try, detain, or punish a fugitive when a court has ruled that the fugitive cannot be so tried, detained or punished.

Extradition: Bilateral Treaties, 1978 Digest, Chap. 3, § 5, at 395–96 (quoting Department of State reply of April 10, 1978).

**12.** Correspondence of the Justices (1793) is discussed in Hart and Wechsler's *The Federal Courts and the Federal System* 65–67 (3d ed. 1989).

cuted, and amounts in fact to no more than an expression of opinion upon the validity of the acts in question.

*Id.* at 361–62, 31 S.Ct. at 255–56.

The Court notes that the continued vitality of *Muskrat* is questionable in light of more recent cases in which the Supreme Court has narrowed the definition of advisory opinions. In *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), the Supreme Court held that the Voting Rights Act of 1965 was constitutional without any direct challenge. The case came to the Supreme Court by way of Section 5 of the Act, which allowed for states to seek declaratory judgments that their voting procedures were constitutional, even without any aggrieved voter to present an adverse presentation. *Id.* at 342, 86 S.Ct. at 826. Only Justice Black, in a lone dissent, pointed out that the controversy in the case was Congress' desire to determine in advance whether proposed state legislation was valid under the Act. *Id.* at 357, 86 S.Ct. at 833. Justice Black noted that "[b]y requiring a State to ask a federal court to approve the validity of a proposed law which has in no way become operative, Congress has asked the State to secure precisely the type of advisory opinion our Constitution forbids." *Id.* at 357–58, 86 S.Ct. at 833.

Similarly, in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court upheld a provision of the Federal Election Campaign Act of 1974 that provided a mechanism by which specified parties could challenge portions of the Act in federal district court. Under the statutory scheme, such challenges would be certified to the Court of Appeals en banc. *Id.* at 172, 96 S.Ct. at 706 (citing 2 U.S.C. § 437h(a)). In ruling on the constitutionality of the statute, the Supreme Court answered a number of certified questions that were presented in the abstract, much like those in Correspondence of the Justices.[13]

Finally, in *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976), the Supreme Court did not even comment on whether a provision in the Northern Cheyenne Allotment Act allowed for an advisory opinion when it granted a statutory right to the Northern Cheyenne Tribe to bring suit in U.S. District Court to determine whether they had received a vested property right under a previous allotment act. *Id.* at 653 n. 5, 96 S.Ct. at 1796 n. 5.

In light of these cases, it is not clear that *Muskrat* remains good law.[14] Nevertheless, assuming that it is good law, a careful evaluation of the extradition statute indicates that it does not allow for advisory opinions.

The problem with Lang's argument is that he erroneously attempts to turn the alleged flaw in the extradition statute into two separate flaws. The problem on the judicial end is not separate from the problem on the executive end; instead, the two are interconnected. If there were absolutely no manner in which the executive branch could revise legal determinations by the judicial branch, then the judicial determination of extraditability obviously would not be an advisory opinion. It would have the binding effect of allowing extradition of the defendant. In other words, any infirmities in the statute stem from the same root issue of executive revision.

Additionally, the judicial determination of extraditability does not suffer from the defects presented in Correspondence of the Justices. First, the issue of extraditability of

13. For an example of these abstract, certified question, consider: "Does 18 U.S.C. § 608(a) (1970 ed., Supp. IV) violate [First, Fifth, or Ninth Amendment] rights, in that it forbids a candidate or the members of his immediate family from expending personal funds in excess of the amounts specified in 18 U.S.C. § 608(a)(1) (1970 ed., Supp. IV)? Answer: YES." *Id.* at 59 n. 67, 96 S.Ct. at 654 n. 67. In that footnote, the Supreme Court actually answered seven subparts of a question and one subpart of another question. In footnote 113, the Supreme Court answered another certified question. In footnote 147, it answered two more questions, and in footnote 177, another question with multiple subparts.

14. *Muskrat* remains cited for its general proposition. *Williams v. Zbaraz,* 448 U.S. 358, 368, 100 S.Ct. 2694, 2700, 65 L.Ed.2d 831 (1980); *Sierra Club v. Morton,* 405 U.S. 727, 732 n. 3, 92 S.Ct. 1361, 1365 n. 3, 31 L.Ed.2d 636 (1972); *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). However, *Katzenbach, Buckley,* and *Hollowbreast* have significantly narrowed the reach of *Muskrat.*

**1394**

a particular extraditee is necessarily before the extraditing court, and not off in the future. Second, the issue is not presented as an abstract and hypothetical inquiry, but with concrete and specific facts and law. Third, there is a proper adversarial presentation before the extraditing court, with both sides represented by counsel. In no sense can the judicial determination be considered an advisory opinion, even under the classical formulation. Considering the recent line of cases of *Katzenbach, Buckley,* and *Hollowbreast,* it becomes even more clear that an extradition order is not advisory.

### b. Subject Matter Jurisdiction

■ Lang also argues that, because of the possibility of executive revision, federal courts lack subject matter jurisdiction, and this lack of jurisdiction is an injury. For this principle, Lang relies on *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). However, *Gerstein* is inapplicable to this issue.

In *Gerstein,* the Supreme Court struck down a Florida statute that allowed the state to detain a person for trial without a probable cause hearing, even if the person had been subjected to a warrantless arrest. *Id.* at 116, 95 S.Ct. at 864. The Court held in *Gerstein* "that the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention." *Id.* at 126, 95 S.Ct. at 869.

*Gerstein* does not support the finding of standing in *Lobue,* because in *Gerstein,* there simply was no provision for a determination of probable cause for detainees arrested without warrants. Under § 3184, however, an extraditee receives at least *two* probable cause determinations: one by the requesting nation before requesting extradition, and one by an Article III or magistrate judge before certification. Moreover, *Gerstein* says nothing about the content of the required hearing; thus, Congress could conceivably lodge the entire extradition hearing before Article I magistrate judges without running afoul of *Gerstein,*[15] and in that event, the *Lobue*

plaintiffs would have no subject matter jurisdiction challenge.

Moreover, it is readily apparent that the defendants in *Gerstein* had something to gain from securing a probable cause hearing, namely, a chance at release. A requirement of a probable cause hearing for those arrested without warrants could only help the defendants. While not all of them would be released, some might in cases where the judicial officer determined that the police lacked probable cause to arrest the defendant. Therefore, they would receive some potential benefit from such a ruling and their injuries were the losses of these chances at release. In *Lobue,* however, even if the problem complained of—executive revision—were removed, there is no indication that the *Lobue* plaintiffs would receive any benefit.

Thus, the subject matter jurisdiction defect in *Gerstein* is not analogous to that identified in *Lobue,* and Lang's asserted injury based on lack of subject matter jurisdiction is without merit.

### c. Lack of Appellate Review

■ Lang raises an interesting argument with respect to the fact that he has no avenue for direct appeal of the finding of extraditability, and as a result he claims a constitutional injury.[16] However, the flaw in this argument is that § 3184 does not prevent appellate review of extradition determinations. Instead, this lack of appellate review stems from the fact that a determination of extraditability is not a final judgment. In *Jhirad v. Ferrandina,* 536 F.2d 478 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976), the Second Circuit stated that:

> Orders of extradition are *sui generis.* They embody no judgment on the guilt or innocence of the accused but serve only to ensure that his culpability will be determined in another and, in this instance, a foreign forum.... Extradition orders do not, therefore, constitute "final decisions of

**15.** In fact, the extradition statute does allow non-Article III judges to certify persons as extraditable. 18 U.S.C. § 3184 (magistrate judges and state court judges).

**16.** Of course, Lang does have some avenue for review in the form of habeas corpus, which is how his challenge to the magistrate judge's finding of fugitive status is presently before the Court.

a district court," appealable as of right under 28 U.S.C. § 1291.

*Id.* at 482. An extradition hearing is therefore most analogous to a preliminary hearing under Fed.R.Crim.P. 5.1(a). The purpose of such a preliminary hearing is to determine whether "there is probable cause to believe that an offense has been committed and that the defendant committed it." *Id.* This hearing is similar to the purpose of the extradition hearing, which is also to determine whether there is probable cause to believe the defendant committed an extraditable crime.

■ Moreover, a decision favorable to a defendant in a preliminary hearing does not bar subsequent prosecution for the same offense. Fed.R.Crim.P. 5.1(b). Similarly, a favorable decision to a defendant resisting extradition does not bar subsequent extradition attempts. *Collins v. Loisel,* 262 U.S. 426, 430, 43 S.Ct. 618, 619, 67 L.Ed. 1062 (1923).[17]

■ Therefore, while lack of appellate review could suffice as an injury in fact for standing purposes, that injury is not caused by the extradition statute. An amended extradition statute without executive revision would not have to allow for appellate review. Since causation is a necessary element of standing, *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136, the *Lobue* plaintiffs cannot claim standing based on a lack of appellate review of extradition orders.

### d. Lack of Accountability

■ Lang's third asserted injury is that there is a lack of accountability where the statutory scheme allows for executive revi-

sion. However, Lang fails to explain how this lack of accountability injures the *Lobue* plaintiffs particularly and concretely, as is required for standing.

In *Lobue,* the court noted that the lack of accountability means that neither the public nor the accused knows who makes the final legal determination of extraditability, and that the public has the right to hold the Secretary of State responsible for the consequences of a given decision. 893 F.Supp. 65, 76 (D.D.C.1995).

■ Unfortunately for Lang, the Supreme Court has repeatedly found no standing where a person seeks to assert generalized grievances of unconstitutional activity, as here where the claimed injury is lack of accountability to the public.[18]

For example, in *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), the respondents sought declaratory and injunctive relief against members of Congress who were serving as reserve officers in the Armed Forces. Respondents argued that such actions violated U.S. Const., art. I, § 6, cl. 2, which states: "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." The Supreme Court denied standing to sue because the respondents had no more personal stake than the general public. *Id.* at 221–22, 94 S.Ct. at 2932. Allowing standing in such cases would potentially lead to abuse of the judicial process and to a distortion in the relationship between the three branches of government.

---

17. The rationale for this principle is stated in the advisory committee note to Fed.R.Crim.P. 5.1(b):
 The state has no appeal from errors of law committed by a magistrate upon preliminary examination and the discharge on a preliminary would operate as an unchallengeable acquittal.
 (quoting *Tell v. Wolke,* 21 Wis.2d 613, 124 N.W.2d 655, 659 (1963), *overruled in part by State v. Antes,* 74 Wis.2d 317, 246 N.W.2d 671 (1976)).

18. One notable exception to this rule is where the challenged statute infringes First Amendment rights. In such an instance, the Supreme Court has allowed defendants standing to raise the

rights of the general public, even where the particular defendant could be legitimately prosecuted. *E.g., Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) (describing the "departure from traditional rules of standing in the First Amendment area"). However, the rationale for overbreadth in First Amendment cases stems from the potentially chilling effect that overbroad statutes have on legitimate free speech. *Id.* at 611, 93 S.Ct. at 2915. In this case, there are no First Amendment overtones and there is no legitimate conduct that may be chilled by the unconstitutionality of § 3184. Thus, the overbreadth doctrine does not apply.

In *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), the Supreme Court similarly denied standing where the respondent sought an accounting from the Central Intelligence Agency concerning its budget and expenditures. *Id.* at 175–76, 94 S.Ct. at 2946. Again, the Supreme Court denied standing to sue, for the same reason as in *Schlesinger.* Thus, the *Lobue* plaintiffs cannot claim standing based on the lack of accountability to the public.

As for lack of accountability to the accused, the *Lobue* court stated that "[t]he practical effect of this buck-passing and finger-pointing is that no one branch, much less a single judicial or executive officer, can be held to answer for the injustices of a particular case." 893 F.Supp. at 76 (alteration in original) (quoting Plaintiff's opposition, at 3).

This argument assumes that federal judges and magistrate judges will shirk the duty imposed upon them by the extradition statute, and instead of evaluating the evidence to determine whether the person is extraditable, will make an arbitrary decision to the detriment of the extraditee. In effect, Lang argues that judicial officers will order extradition in cases where the person should not be extradited, simply because there is no accountability.

■ This asserted injury strains credibility. There is not even a colorable reason to believe that judicial officers are shirking their duties by "buck-passing and finger-pointing." Indeed, one of the reasons that federal judges have life tenure is to insulate them from public pressures. *The Federalist* No. 78 (Alexander Hamilton); *Chisom v. Roemer*, 501 U.S. 380, 400, 111 S.Ct. 2354, 2367, 115 L.Ed.2d 348 (1991) (noting the Framers' intent to shelter federal judges from public opinion by granting life tenure); *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 582–83, 105 S.Ct.

3325, 3334, 87 L.Ed.2d 409 (1985) (noting that life tenure protects the independence of the judiciary and "assure[s] impartial adjudication in federal courts"); *Chandler v. Roudebush*, 425 U.S. 840, 851, 96 S.Ct. 1949, 1955, 48 L.Ed.2d 416 (1976) (noting that federal judges, protected by life tenure, "are more likely to withstand political pressures and render their decisions in a climate tempered by judicial reflection and supported by historical judicial independence"). Indeed, the very lack of accountability of federal judges to the public, Congress, and the President is what ensures their impartiality.[19]

Injury based on lack of accountability to the accused is too speculative and hypothetical for Article III standing purposes. *See Whitmore v. Arkansas*, 495 U.S. 149, 157, 110 S.Ct. 1717, 1724, 109 L.Ed.2d 135 (1990); *O'Shea v. Littleton*, 414 U.S. 488, 497, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). The theme of these cases is that "[a]llegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Whitmore*, 495 U.S. at 158, 110 S.Ct. at 1724–25.

In *Whitmore*, the petitioner was a death row inmate in a state that used a system of comparative review in death penalty cases. Under this system, the state would compare the nature of the crimes committed by a death row inmate against similar crimes. The petitioner sought a mandatory appeal in the state supreme court for a fellow inmate, even though that person had already waived his right to an appeal. The petitioner's argument was that he might obtain future habeas relief, and be retried and reconvicted and resentenced to death, and if so, he wanted the "data base" of cases before the state supreme court to include the fellow inmate's heinous crimes, so that his would pale by

---

19. In this case, the extradition hearing was conducted by a magistrate judge pursuant to § 3184. Magistrate judges, however, are not Article III judges; while they receive some salary protection, 28 U.S.C. § 634, they do not receive life tenure. 28 U.S.C. § 631 (eight year term). Hence, magistrate judges are Article I judges and are not bound by the Case or Controversy requirement of Article III. *See generally Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (discussing the constitutionality of Article I bankruptcy courts, set up as adjuncts to Article III courts). Thus, the constitutional issue identified by the *Lobue* court does not apply to magistrate judges. Moreover, to the extent that magistrate judges serve as adjuncts to Article III courts and are subject to de novo review of legal determinations, the insulation of Article III courts once again presents extraditees with a forum before courts insulated from public pressure.

comparison. 495 U.S. at 156–157, 110 S.Ct. at 1724. The Supreme Court held that, even following the petitioner along his line of argument, it was nothing more than conjecture to believe that the addition of the fellow inmate's crime would lead to a favorable decision on direct review. *Id.*

In *O'Shea,* the plaintiffs claimed that state judicial officers were engaging in discriminatory bondsetting, sentencing, and jury-fee practices in criminal cases. The asserted injury was "that *if* respondents proceed to violate an unchallenged law and *if* they are charged, held to answer, and tried in any proceedings before petitioners, they will be subjected to the discriminatory practices that petitioners are alleged to have followed." 414 U.S. at 497, 94 S.Ct. at 676. The Supreme Court rejected this injury as too speculative and conjectural. *Id.*

Lang's asserted injury falls well within this category of speculation and conjecture. The conjectural chain that one must follow to accept Lang's injury is as follows:

A judicial officer in an extradition hearing knows that *if* he orders extradition, the Secretary of State *might* exercise executive revision, and therefore, the judicial officer can act arbitrarily against an extraditee, since *if* there is any outcry about his decision, he can point to the Secretary of State and claim that the Secretary of State had the final say. This chain of speculative inferences surpasses that in *O'Shea,* where there at least was some evidence of the acts complained of. Thus, lack of accountability to the accused is not a sufficiently actual and imminent injury for Article III standing purposes.

### e. Mere Unconstitutionality

Lastly, Lang argues that the mere unconstitutionality of the extradition statute provides an injury in fact. However, the injury requirement of standing has not been interpreted so broadly. For example, in cases involving challenges to affirmative action programs, the Supreme Court has not allowed standing merely because there is a

potentially unconstitutional racial classification. Rather, the plaintiffs had to show that they were somehow injured by the unconstitutionality. In *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Supreme Court found that the injury inflicted on Bakke by the university's affirmative action program was its "decision not to permit Bakke to compete for all 100 places in the class, simply because of his race." *Id.* at 280 n. 14, 98 S.Ct. at 2743 n. 14.

More recently, in *Adarand Constructors, Inc. v. Pena,* —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), the Supreme Court addressed standing in the context of a challenge to a minority-preference bidding scheme. The Supreme Court held that the "injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing.'" *Id.* —— U.S. at ——, 115 S.Ct. at 2105 (quoting *General Contractors v. Jacksonville,* 508 U.S. 656; ——, 113 S.Ct. 2297, 2304, 124 L.Ed.2d 586 (1993)) (alteration in original).

Thus, it has not been enough in these cases to say that the injury is the application of an unconstitutional statute to the plaintiff; the party must claim some particularized injury caused by the unconstitutionality.[20] The *Lobue* plaintiffs do not appear to have suffered such a concrete and particularized injury in fact.

They are instead in a position analogous to a minority student in the *Bakke* situation who applies to UC Davis Medical School, is eligible for all 100 spots (as opposed to white students, who are eligible only for 84 spots), is rejected, and now challenges the admissions policy as unconstitutional, even though he personally benefitted from it. He could argue, as Lang does, that all he seeks is to be evaluated under a constitutional admissions policy, but unless he can show that he was injured by the admissions program, he would lack standing to challenge the policy, because he was not denied the opportunity to

20. For other such standing cases, consider *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (allowing standing to challenge government's failure to prepare environmental impact statement where plaintiffs alleged direct injury caused by such failure); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (denying standing based on a general claim of violation of federal environmental statutes without showing of individual harm).

compete for all 100 spots. Like these hypothetical minority students, the *Lobue* plaintiffs seek to be reevaluated under a new system, even though there is no indication that they were harmed by the old one.

Similarly, in the *Adarand* situation, a minority-owned business enterprise who lost a bidding contract who lack standing to challenge a set-aside program, even if it were unconstitutional for the same reason as above.

Moreover, while the minorities in these hypotheticals could perhaps claim an injury based on the stigmatizing effect of affirmative action, the *Lobue* plaintiffs have no such claim. There is no cognizable stigma injury from having the Secretary of State reverse a judicial official's finding of extraditability. Accordingly, the Court rejects mere unconstitutionality as an injury in fact.

### 2. Lack of Imminent Harm

 Even if the *Lobue* defendants have suffered a concrete and particularized injury, that injury is neither actual nor imminent, because it does not appear likely that executive revision of judicial determinations actually occurs.

Since 1940, the Secretary of State has refused to surrender persons deemed legally extraditable only four times. 4 Michael Abbell & Bruno A. Ristau, *International Judicial Assistance* 260 (1990) (two times between 1950 and 1990); Note, *Executive Discretion in Extradition*, 62 Colum.L.Rev. 1313, 1328 (1962) (two times between 1940 and 1960).

In 1947 and in 1949, the Secretary of State declined to extradite based on discretion afforded to him under the extradition treaty with Mexico. Note, *supra*, at 1328. In 1976, the Secretary of State refused to surrender an Indian citizen to India to stand trial for embezzlement, despite a district court ruling (affirmed on appeal) that the person was legally extraditable. The grounds for refusal were that fifteen years had passed since the crime was committed, and that, despite the magistrate judge's ruling, the statute of limitations had run, barring prosecution. *Jhirad*

*v. Ferrandina*, 536 F.2d 478 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); Extradition: Procedure, Standards for Evidence, 1976 Digest, Chap. 3, § 5, at 115–16. Arguably, in this case, the Secretary of State exercised executive revision. Yet, this case stands out precisely because it is so unusual.

Nevertheless, the *Lobue* court concluded, without citation to authority, that "[w]hether the Secretary of State has *recently* subjected the legal determinations of the Judiciary to Executive branch review, however, is not the question." *Lobue v. Christopher*, 893 F.Supp. 65, 70 (D.D.C.1995).[21]

The holding in *Lobue* is simply irreconcilable with the case law on standing. Since one of the subrequirements of an injury in fact is that the injury be "actual or imminent," it is in fact highly relevant to a determination of standing to know if executive revision has occurred recently.

In *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court denied standing to a person who challenged the use of chokeholds by police officers. The Supreme Court held that the likelihood of injury was too speculative, since there was only a very small probability that the respondent would be subjected to a chokehold in the future. *Id.* at 105–06, 103 S.Ct. at 1667. The Supreme Court reached this result even though Lyons had already been subjected to a chokehold in the past and even though the police officers *were* still using the chokehold.

In *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), the Supreme Court held that plaintiffs challenging a Connecticut statute that prohibited the dissemination of contraceptives lacked standing. The Supreme Court noted that Connecticut had not enforced the statute in over eighty years, and as a result, the case was missing "the immediacy which is an indispensable condition of constitutional adjudication. This Court cannot be umpire to debates concerning harmless, empty shadows." *Id.* at 508, 81 S.Ct. at 1758.

---

**21.** Lang similarly asserts, without citation to authority, that this issue is irrelevant. At oral argument, Lang's counsel did not address this issue.

In *Boyle v. Landry,* 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971) (companion case to *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)), the Supreme Court again denied standing to plaintiffs challenging a Chicago ordinance prohibiting intimidation. The plaintiffs claimed that they were in danger of being prosecuted for exercising their First Amendment rights. However, "not a single one of the citizens who brought this action had ever been prosecuted, charged, or even arrested under the particular intimidation statute which the court below held unconstitutional." *Id.* at 80–81, 91 S.Ct. at 760.

And in perhaps the closest analogy to this case, the Supreme Court in *Glidden v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), upheld the reconstitution of the United States Court of Claims as an Article III court, even though the judicial branch could not enforce its judgments against Congress. *Id.* at 568, 82 S.Ct. at 1482. Under the statutory scheme in existence in 1962, claims in excess of $100,000 had to be certified by the Secretary of State to Congress. Under the Appropriations Clause, U.S. Const., art. I, § 9, cl. 7, Congress has exclusive responsibility for appropriations. Thus, Congress could refuse to pay claims, and in fact, had done so fifteen times in the 70 years leading up to 1933, when the Court of Claims was an article I court. *Id.* at 571, 82 S.Ct. at 1483. Nevertheless, the Supreme Court held that federal courts could "rely on the good faith of the United States" to pay its claims, and that there was no executive revision problem. *Id.*

Thus, whether executive revision has occurred recently is in fact pertinent to a determination of whether the *Lobue* plaintiffs possessed standing to challenge the extradition statute as being in violation of *Hayburn's Case.* Given that executive revision has occurred at most twice—if even that many times—in the past 50 years, the Court does not believe that revision is at all likely, and for that reason, the defendants in *Lobue* have not suffered a cognizable injury in fact for Article III standing purposes.

### 3. Causation

■ The causal connection requirement focuses on the nexus between the action com-plained of and the injury asserted. In other words, the injury has to be "fairly trace[able] to the challenged action of the defendant." *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976)). Since the defendants suffered no cognizable injury, there cannot be any causation.

### 4. Redressability

■ Finally, even assuming that the *Lobue* plaintiffs can assert a cognizable injury and causation, redressability cannot be shown here because the unconstitutional portion of the extradition statute can be severed from the remainder, and because any relief that the plaintiffs could obtain would only be temporary.

#### a. Severability

■ First, it is well established that the unconstitutional portions of statutes can be severed from the constitutional portions in many circumstances. In *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the Supreme Court noted that:

> Only recently this Court reaffirmed that the invalid portions of a statute are to be severed " 'unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not.' " *Buckley v. Valeo,* 424 U.S. 1, 108 [96 S.Ct. 612, 677, 46 L.Ed.2d 659] (1976) (quoting *Champlin Refining Co. v. Corporation Commission of Oklahoma,* 286 U.S. 210, 234 [52 S.Ct. 559, 564, 76 L.Ed. 1062] (1932)).

*Id.* at 931–32, 103 S.Ct. at 2774. A statute is presumed severable if the remaining portion "is fully operative as a law." *Id.* at 934, 103 S.Ct. at 2775 (quoting *Champlin,* 286 U.S. at 234, 52 S.Ct. at 565).

There is no question that Congress would have intended for the extradition statute to be severable. As a threshold matter, it is important to keep in mind that nowhere does the statute explicitly authorize executive revision; the *Lobue* court *inferred* the possibility of revision from the fact that the judicial officer had to turn over testimony, from leg-

**1400**

islative floor debates from the 1800s, and from a Columbia Law Review student note.

As an example, the extradition treaty between the United States and Switzerland requires the existence of statutory provisions for extradition. Article V of the treaty states in relevant part: "The extradition procedure shall be governed by the regulations in force at the time of the demand, in the State upon which the demand is made." Treaty Between the United States and Switzerland for the Extradition of Criminals, May 14, 1900, U.S.–Switz., art. V, 31 Stat. 1928, 1931, T.S. No. 354.

If the extradition statute were not severable, then there would be no procedures by which the treaty could be implemented. Such a result is completely contrary to the intent of the United States in entering the extradition treaty.

Moreover, simply deleting the requirement that the judicial officer turn over testimony to the Secretary of State would resolve the issue of whether executive revision could occur, and the extradition statute would remain fully operative. Thus, the presumption is that the statute can be saved, and therefore, any asserted injury is not redressable.

### b. Re-extraditability

The *Lobue* plaintiffs might claim that striking down the extradition statute will yield to them the same benefit that striking down a criminal statute yields to a criminal defendant. However, a person facing extradition is in a considerably different position from a person facing criminal prosecution.

 In a typical criminal case, a defendant who successfully challenges a criminal statute cannot be prosecuted under a newly passed statute, because of the *Ex Post Facto* Clause, U.S. Const., art. I, § 9, cl. 3, and the Double Jeopardy Clause, U.S. Const., amend. V.

 The *Ex Post Facto* Clause prohibits the government from punishing a person for an act that was not deemed to be criminal at the time it was committed. *See Burgess v. Salmon,* 97 U.S. 381, 384, 24 L.Ed. 1104 (1878) (holding that an *ex post facto* law is one that imposes punishment for an act not punishable at the time it was committed); *United States v. Stafoff,* 260 U.S. 477, 480, 43

S.Ct. 197, 199, 67 L.Ed. 358 (1923) (holding that Congress may not give retrospective criminality to acts done before passage of construing statute).

The Double Jeopardy Clause, which states that "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb," would similarly bar prosecution under a new criminal statute if jeopardy had attached in the previous prosecution.

 Thus, the injury suffered by a defendant facing prosecution would be redressed by judicial review of a criminal statute. However, the *Ex Post Facto* Clause would not prohibit the United States from extraditing defendants under a newly passed extradition statute, since such a statute does not criminalize acts occurring before its passage. The acts that the defendants are charged with committing (kidnapping in the *Lobue* case; theft in Lang's case) were all criminalized before the defendants committed them. Similarly, double jeopardy does not attach in extradition hearings. *Collins v. Loisel,* 262 U.S. 426, 430, 43 S.Ct. 618, 619, 67 L.Ed. 1062 (1923).

 Moreover, the tolling of the statute of limitations for fugitives continues until the defendant makes "a good faith effort to surrender." *United States v. Gonsalves,* 675 F.2d 1050, 1054, (9th Cir.1982). Similarly, the Second Circuit has held that "a fugitive who executes a formal and voluntary consent to extradition regains the benefit of the statute of limitations." *United States v. Catino,* 735 F.2d 718, 722 (2d Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984).

Therefore, even if the extradition statute is ruled unconstitutional, the statute of limitations on these defendants remains tolled, since they have not consented to extradition. Congress remains free to pass a new extradition statute without the alleged constitutional infirmities of § 3184, and when it does so, the government is free to begin extradition proceedings again. Furthermore, these defendants have already been determined extraditable by a judicial officer; there is no reason to believe that would change. As a result,

any claimed injury by these defendants is not redressable.

### 5. Conclusion

Since standing is a constitutional threshold issue, it must be determined before a federal court can reach the merits of a case. *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136; *Wright,* 468 U.S. at 751, 104 S.Ct. at 3324; *Bakke,* 438 U.S. at 280 n. 14, 98 S.Ct. at 2742 n. 14. While a foreign government seeking extradition of a person might have standing to challenge the extradition statute's constitutionality, it does not appear that defendants facing extradition do.

In a case discussing third party standing cases, the Supreme Court stated that the standing rules "reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Broadrick v. Oklahoma,* 413 U.S. 601, 610–11, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). The extradition statute may indeed be unconstitutional, but *Lobue* is not the proper vehicle for that determination.

The Court concludes that Lang has failed to demonstrate a probability of success on the merits. The Court believes that *Lobue* was decided incorrectly, and that the Court of Appeals for the District of Columbia Circuit will reverse the district court. Therefore, a stay is not warranted.

It is also important to note that the Court of Appeals for the District of Columbia Circuit lifted the nationwide stay on extradition issued by the district court. This lifting of the stay suggests that the Court of Appeals saw no reason not to allow extradition to continue pending resolution of the case.

Accordingly, the Court DENIES the application for a stay of extradition. The temporary stay that the Court issued pending resolution of Lang's request for a stay is HEREBY LIFTED.

### II. Motion for Bail

Lang has also sought release on bail pending resolution of *Lobue.* An underlying assumption of Lang's motion is that his extradition would be stayed. Since the Court will not stay his extradition, there is no compelling reason to release Lang on bail. Accord-ingly, the Court DENIES the motion for release on bail.

### III. Petition for Writ of Habeas Corpus

Finally, Lang has sought collateral review of his extraditability, pursuant to 28 U.S.C. § 2255. The particular issue that Lang challenges is the magistrate judge's finding that he has been a fugitive. This finding tolled the statute of limitations against him under 18 U.S.C. § 3290, which states that "[n]o statute of limitations shall extend to any person fleeing from justice."

### A. Standard of Review

■ Factual findings of the extradition court are reviewed under a clearly erroneous standard. *United States v. Fowlie,* 24 F.3d 1070, 1072 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 742, 130 L.Ed.2d 643 (1995); *Hooker v. Klein,* 573 F.2d 1360, 1369 (9th Cir.), *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978). On collateral review, this Court may inquire whether the crime fell within the terms of the treaty, including any applicable statute of limitations defense. *Caplan v. Vokes,* 649 F.2d 1336, 1340 (9th Cir.1981); *Hooker,* 573 F.2d at 1368.

The ultimate question of whether Lang was fleeing from justice within the meaning of § 3290 is reviewed *de novo* as a mixed question of law and fact with the legal issues dominant. *Fowlie,* 24 F.3d at 1072.

### B. Legal Standard for "Fleeing Justice"

■ The government bears the burden of proving, by a preponderance of the evidence, that "the accused concealed himself to avoid arrest or prosecution." *United States v. Wazney,* 529 F.2d 1287, 1289 (9th Cir.1976).

■ Unfortunately, · there is no clear standard as to what actions constitute avoiding arrest. "Mere absence" from the requesting nation is an insufficient basis for a finding of attempt to evade or avoid arrest. *Caplan,* 649 F.2d at 1341. In *Fowlie,* a two-judge majority of the panel found that the petitioner had indeed fled justice, but for different reasons. Judge Norris focused on the petitioner's actions, while Judge Farris focused on the petitioner's knowledge of charges against him. 24 F.3d at 1072, 1073.

**1402**

### C. Analysis

■ Under either standard, Lang can be viewed as having fled justice. The magistrate judge made the following findings of fact:

1) Lang was aware that he was likely to be prosecuted for the Swiss offenses.

2) Lang left Switzerland and lived in the United States so as to avoid prosecution.

The magistrate judge appeared to base his factual finding that Lang knew he was likely to be charged on the facts that Lang had confessed to embezzling and could not have reasonably expected that he would be able to walk away without any legal repercussions. (Excerpt of Record, at 62:6–17). In particular, the magistrate judge stated: "And so surely he knew that his departure put him in jeopardy." (*Id.* at 62:16–17).

Under Judge Farris' standard in *Fowlie,* the Court need not inquire further. In *Fowlie,* Judge Farris believed that the government proved flight "by showing that Fowlie knew he was wanted by the authorities and *intentionally thwarted* arrest by remaining abroad." 24 F.3d at 1073. Fowlie moved his belongings to Mexico and said that he would never return to the United States, knowing that he was likely to be charged.

In this case, the magistrate judge made a finding that Lang knew he was likely to be charged, a finding that this Court must accept unless clearly erroneous. Lang also moved to the United States under the guise of visiting the Netherlands, and he has not returned to Switzerland. These actions are comparable to those of Fowlie, and thus, under Judge Farris' opinion, Lang would be a fugitive.

Under Judge Norris' standard, the Court must consider Lang's actions more carefully, as opposed to Judge Farris, who considered the defendant's knowledge carefully. In *Fowlie,* Judge Norris found it significant that Fowlie did not return home after learning that he was wanted for arrest. He changed his residence to Mexico and moved his business there.

Again, in this case, there is sufficient evidence for the Court to find that Lang, knowing that he was likely to be charged (especially in light of his acknowledgement of hav-

ing embezzled), moved to the United States and failed to return to Switzerland for his May 22, 1985 interview.

Lang relies on *Caplan* to argue that, because he did not conceal his identity here in the United States, that he was not a fugitive. However, *Caplan* is readily distinguishable. In *Caplan,* the Ninth Circuit found the following facts significant to its finding that the defendant was not a fugitive: (1) Caplan delayed his departure from England for a number of months to allow the investigation *to be completed;* (2) he and his wife applied for non-resident status before departing the country; (3) they gave their future address truthfully; and (4) Caplan returned briefly to England for business purposes twice. 649 F.2d at 1341. None of those factors are present in Lang's case. Thus, the fact that Lang used his true name here is not dispositive.

■ Lang also argues that a number of actions that he took are not consistent with those that a fugitive would take: he obtained credit cards, listed a car in his name and his wife's name, and paid utilities. He argues that his having a post office box and having moved several times in ten years is not indicative of being a fugitive, because many people do so.

Lang's error is that he focuses on actions he took once he was safely entrenched here in the United States. However, for the purposes of determining whether he was a fugitive, the relevant time frame is when he fled the prosecuting country. In *Fowlie,* Judges Farris and Norris examined the defendant's actions and intent in fleeing the United States for Mexico.

■ Moreover, once tolled, the statute of limitations remains tolled until the defendant makes "a good faith effort to surrender." *United States v. Gonsalves,* 675 F.2d 1050, 1055 (9th Cir.1982); *United States v. Catino,* 735 F.2d 718, 722 (2d Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984). These cases suggest that a person does not lose his or her fugitive status simply by living openly; instead, the person must make an affirmative effort to turn himself in to shed the fugitive status.

Despite his claims of having not concealed his identity, Lang cannot be said to have made a good faith effort to surrender. Thus, he remains a fugitive, and the statute of limitations remains tolled.

Accordingly, the Court DENIES the petition for a writ of habeas corpus.

IT IS SO ORDERED.