UNITED STATES of America,
Plaintiff-Appellee,

v.

Stanley F. KREIMER, Charles Lamar
Lewis and Harry L. Walsh,
Defendants-Appellants.

No. 78–5171.

United States Court of Appeals,
Fifth Circuit.

Jan. 2, 1980.

Rehearings Denied Feb. 14, 1980.

Edward T. M. Garland, John R. Martin, Atlanta, Ga., for Kreimer.

Paul L. Hanes, Atlanta, Ga., for Lewis.

Frank J. Shannon, III, Atlanta, Ga., for Walsh.

William L. Harper, U. S. Atty., Atlanta, Ga., Mervyn Hamburg, Atty., App. Section, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before GODBOLD, GEE and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The mail fraud statute, 18 U.S.C. § 1341, condemns any scheme to defraud in which the mails are used. *United States v. Frick,* 5 Cir. 1979, 588 F.2d 531, 536; *United States v. Melvin,* 5 Cir. 1977, 544 F.2d 767, 773, *cert. denied* 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587. The statute does not forbid merely the use of the mails to perpetrate an act made criminal by state or federal law; it reaches any plan, consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property. The scheme is to be measured by a non-technical standard; the measure of fraud is its departure from moral uprightness, fundamental honesty, fair play and candid dealings in the general life of members of society. *United States v. Bruce,* 5 Cir. 1973, 488 F.2d 1224, 1229, *cert. denied,* 1974, 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48. However, the statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract. Its condemnation of a "scheme or artifice to defraud" implicates only plans calculated to deceive. The government must prove not only that there was fraudulent activity but also that the defendant had a "conscious knowing intent to defraud," *United States v. Kyle,* 2 Cir. 1958, 257 F.2d 559, 564, *cert. denied,* 1959, 358 U.S. 927, 79 S.Ct. 312, 3 L.Ed.2d 301.

We here consider whether the evidence offered against persons who were accused

of violating the statute sufficed to prove beyond reasonable doubt that they consciously exploited such a dishonest device or whether, as they contend, there was a reasonable basis to conclude that the evidence showed merely that the defendants engaged in an ingenious business venture that failed. Having examined more than 3000 pages of record and read 146 pages of briefs, and having assessed all of this against the 29-page indictment, we conclude that there was sufficient evidence to support the jury's conclusion that all three of the defendants had joined in a subtle plan calculated to deceive and to injure the firms with which they were doing business, that no reversible error was committed in the trial and that their convictions should be affirmed.

## I.

Considered most favorably to the government, as it must now be, *Glasser v. United States*, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, the lengthy record warrants this bare outline of facts. Kreimer and Walsh were insurance agents, whose agency had been authorized by Interstate Fire Insurance Company to issue financial guaranty bonds obligating Interstate for some portion of the risk underwritten. These bonds were commitments that, if the principal did not repay a loan to a lender, the surety on the bond would pay it. The premium on each bond was to be 2% of the face amount of the bond and it was to be divided with Interstate on an agreed ratio.

Unknown to Interstate, Kreimer and Walsh received substantial additional fees for writing a number of bonds and neither divulged their fees nor shared them with Interstate; the fees were disguised by making checks payable to another company owned by them. In three instances, loans were nominally made in the names of co-defendants and loan guaranty bonds were executed to secure the loan's payment, but the loan proceeds were actually, and surreptitiously, received by Kreimer and Walsh.[1]

On a number of occasions, the borrowers misrepresented to the initial lender the actual purpose of the loans either with the assistance of Lewis and Kreimer or Walsh, or with the knowledge of Kreimer or Walsh, or both. These loans would not have been made had the true purpose of each been divulged, nor would Interstate have been willing to underwrite financial guaranty bonds for them. Kreimer and Walsh were limited to bonds having a face amount of $300,000; several times they wrote two bonds to cover what was in reality a single loan, each bond for less than $300,000, but totalling more than that sum, in order to avoid the maximum limit.

Lewis negotiated one contract with an independent company, secured by a performance bond (not a financial guaranty bond) issued on behalf of Interstate Fire by Kreimer and Walsh, under circumstances that indicated little likelihood of performance; Kreimer later renewed the bond at a time when performance was even less likely, in patent violation of his duty to the bonding company. This circumstance, together with others not only supported the charges against Kreimer and Walsh but also buttressed other evidence that there had been a tripartite plan involving Lewis as well as Kreimer and Walsh. Lewis introduced other persons to Kreimer and Walsh, and assisted in obtaining loans secured by financial guaranty bonds that Lewis, as well as Kreimer and Walsh, knew were not in fact to be used for the purposes announced to the lender. These borrowers paid concealed fees, aside from the premiums, to companies owned by Kreimer and Walsh. Lewis also assisted an ostensible borrower in obtaining a loan from another lender, again secured by a financial guaranty bond, a substantial part of the proceeds of which went to a company controlled by

1. In negotiating with Interstate Fire to act as surety on the bonds, Kreimer and Walsh represented that the principal for whom each loan guaranty bond was written would be required to provide collateral with a distress value at least twice as large as the face amount of the financial guaranty bond; for reasons discussed below, the government did not prove that this was not done.

Kreimer and Walsh. The evidence warranted the conclusion that, to provide Kreimer and Walsh with funding to purchase the outstanding stock of an insurance company (Mt. Vernon), Lewis joined in a plan with Kreimer and Walsh to obtain loans totalling $625,000 in the names of other borrowers, obtain financial guarantee bonds on these loans, and divert the proceeds to the use of Kreimer and Walsh.

Kreimer and Walsh's insurance company was required to furnish Interstate Fire with a list describing each bond issued that month. The list, called a bordereaux in the insurance industry, failed on occasion to show bonds in which Walsh and Lewis or Kreimer had an interest; it did not list a bond issued in excess of the $300,000 limit; and it showed as separate entries two bonds written for a single loan having a total over $300,000, the maximum limit authorized by Interstate Fire. On inquiry by Interstate Fire, Kreimer said that part of the loan secured by the two bonds had been satisfied when, in fact, the total was still due. One bond was listed as $325,000; when inquiry about this was made, a representative of Kreimer and Walsh's company said that $25,000 had been reinsured by another company. This was untrue.

About 2000 bonds were issued during the period, but only fourteen were issued in connection with the transactions that served as bases for the criminal charges. Interstate Fire terminated the agreement with Kreimer and Walsh seven months after it began. Substantial losses were thereafter suffered on the bonds that had been written.

Kreimer and Walsh were indicted on twelve counts. Some were dismissed by the government, some by the court, and on some they were acquitted. They were each convicted on six counts. Lewis was indicted on ten counts; he was acquitted on two and convicted on four.

Kreimer and Walsh's convictions were: four counts of mail fraud; one count of

transporting securities obtained by fraud in interstate commerce; and one count of conspiracy to commit those offenses. Lewis was also convicted on the conspiracy charge, on two of the mail fraud counts and on one interstate transportation count. A general sentence was imposed on Kreimer and Walsh of four years imprisonment on all counts, but their prison sentence was suspended and they were placed on probation for five years. The court dealt with Lewis more severely; he was sentenced to four years.

Because the sentence of each of the three defendants runs concurrently, each has been sentenced to less than the statutory maximum allowable for any single count on which he was convicted. The government asserts in its brief and the defendants do not challenge, that we need not here review all of the evidence on each count if there was enough on any single count. *United States v. Webb,* 5 Cir. 1972, 463 F.2d 1324, 1327, *cert. denied* 409 U.S. 986, 93 S.Ct. 338, 34 L.Ed.2d 251. We have concluded that the defendants will not suffer adverse consequences from unreviewed convictions; therefore, it is unnecessary to weigh the evidence on each count separately.[2]

## II.

Congress has not undertaken to catalog the infinite variety of the myriad schemes to defraud that might be concocted by the fertile minds of those bent on despoiling others by cunning. It has branded criminal any use of the mails knowingly and intentionally to achieve a fraudulent end. Kreimer, Walsh and Lewis may have engaged, indeed, likely did engage in hundreds of lawful transactions. The question is not how many times they obeyed the law but whether or not on the occasions charged they violated it.

■ There was evidence enough, we are satisfied, without ponderously examining each scrap, to warrant the jury's conclusion

---

**2.** Neither the defendants nor the prosecution attempted to do so in their briefs or during oral argument.

that all three engaged in a conspiracy to defraud, that it involved more than a dozen transactions entailing substantial sums, and that it was a witting and crafty scheme, not a lawful business plan that through misadventure went awry. We are further satisfied that there was sufficient evidence to warrant belief beyond reasonable doubt that all three engaged at least once in the use of the mails to defraud and that all three joined in the interstate transportation of securities obtained by their fraud. We turn then to specifics by which the verdict is sought to be impeached.

### A.

The government contended that Kreimer and Walsh represented that each loan would first be secured by collateral worth at least twice the amount of the bond. It contended also that, in fact, Kreimer and Walsh did not require such collateral. The only evidence it offered to support this contention was that, when some of the loans were eventually not paid and the bondsman was accordingly called on, Interstate Fire realized little or nothing. In typical adversarial posture, the defendants contend that this evidence was irrelevant and inadmissible, the government that the evidence proves its charge. Both are wrong.

■ Evidence concerning the amount realized on the collateral was not inadmissible. While remote, it had some logical tendency to support the argument that the collateral was overvalued, and it was, therefore, relevant and admissible. Fed.R.Evid. 401; *see United States v. Madera*, 5 Cir. 1978, 574 F.2d 1320, 1322. However, standing alone, as it did, this evidence was too weak to support the government's thesis: what a property sells for at forced sale two years after an appraised valuation would not of itself suffice to establish its value

two years before let alone that the appraisal had been made with conscious intent to defraud.[3] Hence the trial court was correct in admitting the evidence, but, absent other evidence, the record would not support the deduction advanced, and we, therefore, conclude that the government did not prove a deficiency in collateral.

### B.

This does not break the net. There were strands aplenty to warrant the conclusion that, even if this contention was not proved, the defendants engaged in a scheme to defraud.

■ The indictment was in part (Counts 1–7) predicated on the assumption that Walsh and Kreimer had a fiduciary relationship with Interstate Fire and violated their trust. Walsh and Kreimer attack this vigorously, perhaps on the assumption that an insurance agent does not have a fiduciary responsibility to the company that he represents. If there was a fiduciary responsibility, it was established by state law. *Cf. United States v. Foshee*, 5 Cir. 1979, 606 F.2d 111. The law of Georgia, where Walsh and Kreimer did business and most of the bonds were executed, does impose on the agent of a surety, as it does indeed on any agent, the duty, fiduciary in nature, to deal honestly and openly with his principal.[4] Kreimer and Walsh withheld facts that they should have disclosed, surreptitiously took money that they should never have exacted (or should at least have shared), cloaked transactions to conceal their own involvement and entered into undertakings where their personal interest was in conflict with their duty as agents. Their duty, as agents, may not have exacted the same punctilio demanded of trustees, but it was a duty of fidelity, hence fiduciary in nature; by any standard to which an

---

3. Some of the forced sales were made even later than two years after the transaction.

4. *See Franco v. Stein Steel & Supply Co.*, 1970, 227 Ga. 92, 179 S.E.2d 88, *cert. denied*, 1971,

402 U.S. 973, 91 S.Ct. 1661, 29 L.Ed.2d 137; *Denham v. Shellman Grain Elevator, Inc.*, 1971, 123 Ga.App. 569, 181 S.E.2d 894; *Spratlin, Harrington & Thomas, Inc. v. Hawn*, 1962, 116 Ga.App. 175, 156 S.E.2d 402.

agent is held, their conduct could be construed fraudulent.[5]

### C.

Lewis' attempt to portray himself as a "passive and neutral bystander," *United States v. Moore*, 5 Cir. 1974, 505 F.2d 620, 622, *cert. denied* 1975, 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785, sucked into the tornado when disaster struck Kreimer and Walsh, could have been accepted by the jury. Yet there was also evidence enough for them to view him as a knowledgeable joint participant with the other defendants in the light shed by a number of globes: his close and continuing association with Kreimer and Walsh;[6] his participation in the making of a number of loans secured by financial guaranty bonds; his furnishing of collateral to support the issuance of these bonds, collateral whose value, however large, was manifestly speculative; his representations to a prospective borrower that the insurance agents would not issue a bond to him unless he increased the amount of the loan to provide Kreimer and Walsh with secret funds; his securing of a performance bond renewal from the insurance agents, without additional cost, at a time when he (as well as they) knew or should have known that he could not perform the contract underwritten; and his role in obtaining a bank loan by false representations as to its purpose and then diverting the proceeds to Kreimer and Walsh.

### D.

There is likewise no merit in the argument that Interstate Fire might have looked beyond the bordereaux, examined the insurance agency books and learned the truth about any apparent misstatements in the monthly report. The victim's negligence is not a defense to criminal conduct. The truth about virtually every scheme to defraud could be obtained if the gull were clever and diligent enough. The truly careful are, perhaps, never defrauded because they are not deceived by the artifice. The laws protecting against fraud are most needed to protect the careless and the naive from lupine predators, and they are designed for that purpose. *Lemon v. United States*, 9 Cir. 1960, 278 F.2d 369, 373. "[E]ven 'the monumental credulity of the victim is no shield for the accused.'" *Blachly v. United States*, 5 Cir. 1967, 380 F.2d 665, 672 n.13 (quoting *Deaver v. United States*, D.C.Cir.1946, 81 U.S.App.D.C. 148, 153, 155 F.2d 740, 745). Neither was it necessary to prove that either Kreimer or Walsh personally prepared the bordereaux; the act was done in their behalf if not by them. Their complicity might be inferred.

### E.

Various other fusillades are fired. It is contended that intent to defraud was not shown. This was, under the ample circumstantial evidence, a jury issue. *See Shale v. United States*, 5 Cir. 1968, 388 F.2d 616, 618, *cert. denied*, 393 U.S. 984, 89 S.Ct. 456, 21 L.Ed.2d 445; *United States v. Lichota*, 6 Cir. 1965, 351 F.2d 81, 89, *cert. denied*, 1968, 382 U.S. 1027, 86 S.Ct. 647, 15 L.Ed.2d 540.

### F.

The parole evidence rule that, in contract cases, prevents the parties to a

---

5. In addition, their conduct with regard to various lenders, with whom they had no agency relationship, could also be construed as fraudulent. For example, to obtain a loan from the First National Bank of St. Petersburg, Kreimer collaborated with Lewis and a co-defendant, Jernigan to mislead the bank concerning the purpose of the loan and the likelihood of future benefits to the bank in the form of deposits. Kreimer then wrote an Interstate Fire bond to guarantee the loan and concealed the fact that the loan proceeds were destined to go to Kreimer and Walsh.

6. It was in this connection that the challenged evidence about the TRW transaction was admissible. The issuance to TRW of the performance bond for a Lewis-connected corporation was the first overt act charged in the conspiracy indictment. Moreover, proof of the circumstances surrounding this transaction tended to show Lewis' knowledge and state of mind when he pledged his corporation's shares to secure other financial guaranty bonds and when he obtained from his co-defendants renewal of the bond securing this arrangement.

written contract from offering evidence that the contract was something different does not apply in criminal cases. The government is not a party to the contract. *See Shale v. United States*, 5 Cir. 1968, 388 F.2d 616, 619, *cert. denied*, 393 U.S. 984, 89 S.Ct. 456, 21 L.Ed.2d 445. Moreover, the very essence of fraud may be deceit about what is written; for this reason, even in civil litigation between the parties, the parole evidence rule does not prevent the use of extrinsic evidence to show fraud. *Hinds v. Plantation Pipe Line Co.*, 5 Cir. 1972, 455 F.2d 902, 906.

## G.

■ The court's rulings permitting hypothetical questions to the expert witnesses and admitting their answers were well within its discretion. *See* Fed.R.Evid. 403, 703. The hypothetical questions demonstrated how the bankers would have acted had they been given the benefit of full disclosure and fair dealing. Thus, the testimony was relevant and its probative value outweighed the prejudice to appellants. *See* Fed.R.Evid. 403, 703; *United States v. Bush*, 7 Cir. 1975, 522 F.2d 641, 649–50, *cert. denied*, 1976, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748; *United States v. Isaacs*, 7 Cir. 1974, 493 F.2d 1124, 1162, *cert. denied* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146.

## H.

■ Neither did the court err in receiving those four exhibits whose admissibility is now challenged. They were initially received without objection. The court ruled that the two documents later challenged would be admitted in evidence, but that the government would not be permitted to argue the truth of the matter contained in one of them. The appellants now claim for the first time that reversible error was committed in the admission of the other two exhibits. The challenge is failure to lay a proper foundation or prove authenticity. To the extent that they failed to make proper objections below, they deprived the government of the opportunity to adduce foundation evidence, and they cannot be permitted to present a challenge at this juncture. *United States v. Fendley*, 5 Cir. 1975, 522 F.2d 181, 185–86. On their face, the exhibits are authentic and relevant and their admission cannot be deemed plain error affecting appellants' substantial rights. *See United States v. Leaman*, 5 Cir. 1977, 546 F.2d 148, 150, *cert. denied*, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227.

## I.

■ The list of Interstate Fire financial guaranty bonds written by appellants and their disposition was challenged on the basis that some of the files from which the list was prepared had not been made available to the defense. Defense counsel had known about the exhibit for three weeks, and had easy access to underlying documents. The court's ruling admitting the list was within its broad discretion. *See United States v. Madera*, 5 Cir. 1978, 574 F.2d 1320, 1322. The absence of abuse is underscored by the purely collateral value of the exhibit and its limited use during trial as well as the absence of a claim that appellants were substantially prejudiced by the admission of that exhibit into evidence.

We cannot conclude that there was a reasonable basis to believe that any of the three appellants was a lamb led to government slaughter, that there was prejudicial error in their lengthy trial, or that the jury was not warranted in concluding that all three knowingly acted in concert to deceive and to defraud Interstate Fire and others with whom they engaged in business. For these reasons, each of the judgments is AFFIRMED.