UNITED STATES of America,
Plaintiff,

v.

Ramiro FERNANDEZ–MORRIS and
Regina Fernandez–Morris,
Defendants.

No. 98–2019–CIV.

United States District Court,
S.D. Florida.

July 19, 1999.

Kenneth Noto, Asst. U.S. Atty., U.S. Attorney's Office, Miami, FL, for Plaintiff.

David B. Rothman, Thornton & Rothman, Miami, FL, for Defendants.

## ORDER DENYING REQUEST FOR CERTIFICATE OF EXTRADITABILITY

GARBER, United States Magistrate Judge.

The Government is seeking to extradite two American citizens, Ramiro Manuel Fernandez Moris ("Ramiro") and his daughter Regina Fernandez Moris ("Regina") (collectively the "Fernandezes") to Bolivia pursuant to a conviction obtained in absentia in a Bolivian court more than five years ago on August 5, 1993. A Bolivian judge found that both of the extraditees were guilty of "fraud, illegal association, and breach of trust" and sentenced them to seven-year prison terms. In that same trial, two other members of the Fernandez family, Regina's brothers, Ramiro Rafael Fernandez Moris ("Ray") and Roman Fernandez Moris ("Roman"), were also convicted. Four years after their conviction, an attorney hired by Rene Arce Moscoso ("Arce"), a former business partner of the Fernandez brothers who had brought the criminal complaint, petitioned the same Bolivian judge to extradite Defendants. On September 23, 1997, a warrant was issued for the arrest of Ramiro, Regina, Ray and Roman. Extradition is only sought for Regina and Ramiro.[1]

■ The Government brings this action pursuant to an extradition treaty in force between the United States and Bolivia, signed June 27, 1995.[2] An extradition treaty creates in a foreign government the right to demand and obtain extradition of an accused criminal. *Quinn v. Robinson*, 783 F.2d 776, 782 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). Absent a treaty, the federal government lacks the authority to turn the accused over to the foreign government. *Id.* The Court is cognizant of its obligation to approach "challenges to extradition with a view toward finding the offense within the treaty." *McElvy v. Civiletti*, 523 F.Supp. 42, 49 (S.D.Fla.1981). Moreover, extradition treaties are to be liberally construed so as to effect their purpose, that is, to surrender fugitives for trial for their alleged offenses. *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 14, 57 S.Ct. 100, 81 L.Ed. 5 (1936); *Factor v. Laubenheimer*, 290 U.S. 276–301, 54 S.Ct. 191, 78 L.Ed. 315 (1933); *McElvy v. Civiletti*, 523 F.Supp. at 49. Pursuant to the Government's Complaint, the Fernandezes were provisionally arrested on September 4, 1998 and were subsequently released on bond.

■ The Court must now determine pursuant to 18 U.S.C. § 3184 whether the evidence provided by the Bolivian government in support of its application for extradition is "sufficient to sustain the charge under the provisions of the proper treaty or convention." In order for an extradition to be proper, there must be: (1) criminal charges pending in another state; (2) the charges must be included in the treaty as extraditable offenses; and (3) there must be probable cause to believe that a crime was committed and that the persons before the Court committed it.

---

1. No explanation has been offered to the Court for why extradition has only been sought with respect to two of the four defendants. Moreover, based on the Court's review of the case, it appears that Regina and Ramiro are the least culpable of the four defendants.

2. Defendants do not dispute the applicability of that treaty which provides for extradition for crimes that are punishable "under the law of both Parties by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." Extradition Treaty, June 27, 1995, U.S.-Bol., Art. II (hereafter "Extradition Treaty").

*See United States v. Barr,* 619 F.Supp. 1068, 1070 (E.D.Pa.1985). In making these determinations, the credibility and weight of the evidence are exclusively within the discretion of the Magistrate Judge. *Noel v. United States,* 12 F.Supp.2d 1300, 1303 (M.D.Fla.1998) (citing *United States v. Wiebe,* 733 F.2d 549, 553 (8th Cir.1984); *Garcia–Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972)), *aff'd,* 180 F.3d 274 (11th Cir.1999) (Table, No. 98–3551). "The extradition hearing is not a trial on the merits to determine guilt or innocence, but serves as a means of ensuring that probable cause exists to believe the person whose surrender is sought has committed the crime for which his extradition is requested." *Castro Bobadilla v. Reno,* 826 F.Supp. 1428 (S.D.Fla.1993), *aff'd,* 28 F.3d 116 (11th Cir.1994).

> The purpose [of the extradition hearing] is to inquire into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country, that the alleged conduct, if committed in the United States, would have been a violation of our criminal law, and that the extradited individual is the one sought by the foreign nation for trial on the charge of violation of its criminal laws.

**3.** 18 U.S.C. § 3190 governs the admissibility of evidence and provides as follows:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for purpose of such hearing if they shall be properly and legally authenticated so as to enable them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

The documents in this matter were properly certified and thus admissible under § 3190.

**4.** There is no dispute that a treaty was in full force and effect. Moreover, the Court has jurisdiction over both Regina and Ramiro.

*Peroff v. Hylton,* 542 F.2d 1247, 1249 (4th Cir.1976)(denying habeas corpus petition where there was no basis for suspecting that Sweden's criminal system would not protect the petitioner from criminal elements that might harm him), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977). Although hearsay and other excludable evidence may be admissible at an extradition hearing,[3] Defendants may only introduce evidence which explains rather than contradicts the evidence presented by the government. *Id.* at 1433. Testimony that merely gives the opposite version of the facts does not destroy the probability of guilt. *Id.*

The question that faces the Court in this matter is two-fold. First, has the Government established probable cause with respect to the two Defendants for which Bolivia seeks extradition?[4] *See Yapp v. Reno,* 26 F.3d 1562, 1564 (11th Cir.1994) (standard of proof for extradition is probable cause). Second, has the Government demonstrated that there is dual-criminality, i.e., are the actions which were allegedly committed of a criminal nature as opposed to a civil matter?

### *FACTUAL BACKGROUND*[5]

In general, the complaint filed in Bolivia by Arce, a private citizen, made numerous

**5.** The Court has outlined this entire factual scenario for the benefit of the reader's understanding of the facts of this case as alleged by Defendants and the Government. At times, Defendants have attempted to introduce to the Court evidence that arguably conflicts with that being offered by the Government. The Court may not consider conflicting evidence. *Collins v. Loisel,* 259 U.S. 309, 315–17, 42 S.Ct. 469, 66 L.Ed. 956 (1922) (no conflicting evidence); *see also Abu Eain v. Adams,* 529 F.Supp. 685 (N.D.Ill.1980) (no evidence of alibi); *In re Locatelli,* 468 F.Supp. 568 (S.D.N.Y.1979) (no evidence to impeach credibility of government's witnesses). The Court, for purposes of its analysis regarding probable cause or dual criminality, has only relied upon the Government's own submissions and the evidence of Defendants which is explanatory in nature. While Defendants' detailing of the factual circumstances was helpful and provided some explanation for facts

allegations against the Fernandez family members. Specifically, they are accused of participating in a scheme to defraud Arce in connection with a business partnership with the Fernandez brothers. According to the Government's papers, the brothers wanted to have Arce finance lumber purchases in Bolivia for lumber to be shipped to their American customers. Arce in his sworn statement declared that during December 1990, a meeting occurred at the office of his company, MAFICO, at which Ray and Ramon Fernandez and his son, Rene Arce Romero were present. At this meeting, those present discussed the possibility of working together to export mahogany lumber, a business in which the Fernandez brothers were already engaged. The Fernandez brothers proposed a pilot project in which they would issue a letter of credit to MAFICO in favor of their company, EMADEX, upon the condition that MAFICO obtain bank financing for the purchasing of the wood to be exported. Arce does not contend that this arrangement was criminal or fraudulent because he made a profit on the project. Indeed, the Arces and the Fernandez brothers each received 50% of the profit from this venture.

In February 1991, the first step was taken in this pilot project between EMADEX and MAFICO when a Letter of Credit ("LC") for $140,000 by the East Asiatic Timber Americas Company ("EAC") was opened. The LC was drafted against the Danske Bank in Denmark and had a transferable interest in favor of EMADEX. EMADEX transferred this interest to assist MAFICO with obtaining financing from Banco Boliviano Americano ("BBA"). A special joint account in the name of MAFICO and requiring signatures from both an Arce and a Fernandez representative was established for this pilot project.

The BBA provided MAFICO with the loan. In furtherance of this venture, Ro-

man later bought the lumber from a sawmill in Santa Cruz and saw to it that the lumber was shipped to its final destination in Greensboro, North Carolina. During this time, the Fernandez brothers agreed to make a personal advance to Arce of $25,000 from the proceeds of this loan even though this amount exceeded his share of expected profits from the venture.

On June 4, 1991, EAC provided EMADEX with a large purchase order. The order was accompanied by a $1.1 million LC which was similar to prior ones in that it was transferable in whole or in part and drawn in favor of EMADEX. Arce and the Fernandez brothers decided to combine their efforts in this project as they had in the pilot project. The LC was transferred to Arce so that he could obtain financing from the bank. The BBA provided a loan for 80% of the LC in two installments. The first installment of $580,000 was deposited into a joint account that required two signatures—one from the Arce family and one from the Fernandez family. Arce then requested a $225,000 loan to which Ray reluctantly agreed.

On June 26, 1991 and July 7, 1991, several shipments of lumber were delivered to EAC. At that point, the bank provided the second installment of $300,000. Meanwhile, Arce failed to repay his loan which reduced the company's working capital. In order to prove his commitment to the venture, Arce agreed to bind himself to EMADEX. A formal partnership agreement between MAFICO and EMADEX was signed on July 24, 1991. The agreement gave the Arce 50% ownership and the Fernandez brothers 50% ownership and established a joint account that required the signatures of both before funds could be released. In August 1991, Ray and Arce joined with BBA to purchase a sawmill, TAMURA S.R.L. and timberland valued at $2.8 million. The BBA and Arce each held a 45% interest and Ray owned a

which were obscure in the Government's presentation, the Court need not rely on those

facts in reaching its legal conclusions as discussed, *infra*.

10% share with an option to buy 5% from each of the other partners.

The EMADEX/MAFICO partnership continued its established custom of sending some of its wood to the United States to an agent of EMADEX, WEST FRONTIER. In or about October 1991, WEST FRONTIER changed its name to EMADEX INTERNATIONAL, INC. The Miami-based company continued to act as the U.S. agent of EMADEX, and was headed by the Fernandez brothers' father, Ramiro, a Defendant in this action. The relationship between the two companies was known to all involved through weekly account statements provided to Sergio Urquidi Alvis ("Sergio"), the EMADEX accountant, and to the Arce partners. The bills of lading also clearly indicated the existence of EMADEX INTERNATIONAL, INC.

By September 1991, Arce still had not repaid the loan and EMADEX was suffering from a lack of capital. Accordingly, the partners met and agreed to send lumber in smaller quantities to customers such as EAC, send more lumber to EMADEX INTERNATIONAL, INC. to generate higher profits, and Arce agreed to pay back at least $150,000 by the beginning of October 1991 and repay the balance as soon as possible. EAC for its part granted the partnership a 60–day extension on the LC, and EAC agreed to help EMADEX by making direct payments on future shipments. Proceeds from the shipments to other entities were made into the joint account as had been the practice in the past and proceeds from EMADEX INTERNATIONAL were handled as they had been in the past with its predecessor, WEST FRONTIER, by putting the money in the EMADEX account (634–41). That account was converted to a joint account on November 30, 1991, and Arce was made a signatory at that time.

In mid-October 1991, Ray broke his ankle and was forced to work at home. Accordingly, he asked his sister, Regina, to purchase some small office equipment in Miami and send it to him in Santa Cruz. Later that year, Regina, who was unmarried and had no children, came to Santa Cruz to take care of administrative duties while Ray vacationed with his family over the Christmas holiday.

The parties then purportedly entered into an arrangement whereby Arce, Rene Andres Arce Romero and Pablo Marcela Moscoso purchased 50% of a new corporation and the Fernandez brothers owned the other 50%. The parties divided the responsibilities for the new venture in much the same way that the pilot project had been organized. MAFICO obtained financing through the Banco Boliviano Americano and guaranteed $1,300,000 in credit by mortgaging certain assets.

Arce's Complaint alleged that during the course of these business dealings, the four Fernandez family members perpetrated a fraud and engaged in various illegal activities. First, Arce claims that Ray re-routed the delivery of wood in order to obtain the funds provided by the letter of credit in contradiction to the agreement between the parties. Arce then alleges that Ramiro, the father of the Fernandez brothers, who was an executive in a company named EMADEX, INTERNATIONAL, INC., created that company as a decoy to confuse purchasers so it could receive some payments from companies which purchased the re-routed wood. According to Arce, those funds should have been deposited in the joint account over which he exercised some control. Instead, Arce claims that payments were made to an account at Banco de la Union that was controlled exclusively by Ramon and was opened in January 1991. In addition, Arce contends that Regina, who was in Bolivia for a matter of weeks, filled out and signed certain invoices even though she was not an authorized executive of the company. Moreover, when Regina left Bolivia, Arce contends that she took documentation and office equipment with her. Finally, Arce seeks damages in the amount of $639,438.34 for the re-routing of the wood and

an additional $138,192.27 which Defendants allegedly withdrew from the joint account.

## CRIMINAL STATUTES AT ISSUE

The crimes that the Fernandez family is accused of are fraud, illegal association, and breach of trust. Article 335 of the Penal Code of Bolivia provides the following with respect to fraud:

To induce someone to commit an error through cunning or deceiving, illegally obtaining money or other benefit or economic advantage, will be sentenced to imprisonment from one to five years and to the payment of a penalty of sixty to two hundred days.

This is supplemented by Art. 2nd, Number 54, of Law 1768 Law of Modifications to the Penal Code.

A person who, with the intention of obtaining for himself or for a third person undue economic benefit, by means of deceiving or cunning causes another person to fall error by committing an action or disposing of assets in prejudice of the subject error or of a third person, will be sentenced with imprisonment from one to five years and with a penalty of sixty to two hundred days.

In addition, Illegal Association is defined by Art. 132 of the Penal Code:

Whoever is part of an association consisting of four or more persons for the purpose of committing crimes or offenses, will be sentenced to imprisonment of six months to two years or to work for one month to a year. The same penalty will apply to all who are part of a juvenile gangs for the purpose of causing disorders, offense, injuries or any other crime.

Finally, Article 346 defines Breach of Trust as follows:

A person who taking advantage of the trust deposited by another person, causes damage or prejudice to the assets

of that person, or keeps as his own those received by possessory title, will be confined three months to two years.

## CRIMINAL PROCEEDINGS IN BOLIVIA

The trial in Bolivia was conducted in absentia pursuant to Arce's sworn statement that he did not know the whereabouts of the Defendants. Under Bolivian law, notice in a local newspaper is sufficient to provide notice to Bolivian citizens whose whereabouts are unknown. *See* Affidavit of Omar Barrientos Chavez (hereafter "Barrientos Aff.") ¶ 15. In the case of foreign defendants, Bolivian law requires that residents of foreign countries are to be notified through application by Bolivian courts to the foreign courts to bring the defendants to Bolivia. Barrientos Aff. ¶ 5. In this instance, however, the Bolivian court was aware that Defendants did not reside in Bolivia as the Complaint described them as North Americans of Cuban origin. Moreover, documents used in the trial indicated the corporate address of related entities in Miami, Florida. For example, attached to the Bolivian court's findings were documents on Emadex stationery indicating the corporation's United States address. Additionally, Arce was aware of the whereabouts of Defendants as he was pursuing other litigation in a suit filed on January 14, 1992, in which EMADEX, S.R.L. sued EMADEX INTERNATIONAL, INC. in Clarendon County, South Carolina. In fact, on February 24, 1992, the plaintiff in that case opened an action in Dade County Circuit Court, Florida (Case No. 92–4326) for the purpose of domesticating deposition subpoenas issued by the court in South Carolina.[6] Thereafter, subpoenas and notices of deposition were issued to Ramiro and Regina scheduling their depositions for July and August 1992 in Miami, Florida. Nevertheless, notice of the Bolivian criminal charges and trial to Defendants consisted of a one-day advertisement in a Santa Cruz, Bolivia newspaper. Barrientos Aff. ¶ 5.

6. The case was closed as of November 19, 1993.

In addition to the complete lack of notice to Defendants, the trial was conducted under circumstances which seriously call into question its legitimacy. One public defender was appointed to represent all four defendants. He made no attempt to contact his clients; he offered no evidence in their defense; he did not cross-examine any of the witnesses; he conducted no investigation; he lodged no objections; and he waived his clients' right to appeal. Not surprisingly, all of the defendants were sentenced to identical seven-year prison terms in part based on their contempt of court for failing to appear for trial. Four years after their convictions, a lawyer hired by Arce petitioned the Court to extradite the four defendants. On November 7, 1997, the United States Ambassador to Bolivia authenticated the Bolivian documents in support of the extradition of Regina and Ramiro Fernandez–Moris.

### *DISCUSSION*

Defendants oppose their extradition on several bases. First, they contend that the dual criminality requirement has not been satisfied in this case because the allegations are more correctly characterized as a business relationship gone bad, that is, a matter for a civil court. Second, the Fernandezes suggested that there is lack of probable cause to believe that a crime was committed. Moreover, and perhaps more importantly, they contend that there is also a lack of probable cause to believe that Ramiro and Regina committed any crime of which they stand convicted. Finally, they contend that the pervasive due process violations that infected the proceedings in Bolivia obliterate any showing of probable cause, and that is reason alone to deny extradition.

**A. The Government Must Show Probable Cause To Believe That Defendants Have Committed The Crimes For Which They Were Convicted In Absentia In Bolivia.**

▮ The standard for a finding of probable cause is defined by federal law.

*Sindona v. Grant,* 619 F.2d 167 (2d Cir. 1980). Probable cause means that there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the guilt of the accused. *Coleman v. Burnett,* 477 F.2d 1187, 1202 (D.C.Cir.1973). "Conclusory statements do not satisfy the probable cause standard." *In re Lehming,* 951 F.Supp. 505, 517 (D.Del.1996) (failing to find probable cause where the report relied upon by the government did not personally implicate the relator in the transaction thus leaving that court to speculate as to the nature of his involvement). It is not this Court's duty to determine whether evidence is sufficient to justify a conviction, but rather, to determine if the evidence is sufficient to hold the accused. *Collins v. Loisel,* 259 U.S. at 316, 42 S.Ct. 469; *In re Sindona,* 450 F.Supp. 672, 687 (S.D.N.Y.1978) (finding probable cause that bankruptcy fraud was committed where the evidence indicated "pervasive manipulation and falsification of the books").

▮ Because Defendants were convicted in absentia, that conviction is only considered a charge of a crime rather than a conviction for purposes of the Court's probable cause analysis. *In re Mylonas,* 187 F.Supp. 716, 721 (N.D.Ala.1960) (denying extradition where in absentia conviction was obtained more than three years before Greece made its extradition request). Nevertheless, as the Supreme Court has said, the magistrate "should not accept without question the complainant's mere conclusions that the person whose arrest is sought has committed a crime." *Giordenello v. United States,* 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). This independent review allows a magistrate to perform a " 'neutral and detached' function and not serve merely as a rubber stamp ...." *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Indeed,

[Magistrate judges] must, under Article III of the Constitution, exercise their independent judgment in a case or controversy to determine the propriety of an individual's extradition. The executive may not foreclose the courts from exercising their responsibility to protect the integrity of the judicial process. A court must ensure that it is not used for purposes which do not comport with our Constitution or principles of fundamental fairness.

*Ahmad v. Wigen*, 726 F.Supp. 389, 412 (E.D.N.Y.1989) (rejecting petition for habeas corpus where petitioner will receive full and satisfactory due process in Israel and will have full appeal upon any conviction), *aff'd*, 910 F.2d 1063 (2d Cir.1990). Moreover, as the *Ahmad* court stated: "[w]e cannot blind ourselves to the foreseeable and probable results of our jurisdiction." *Id.* at 410 (calling the theory a due process exception to the rule of non-inquiry).

 A fugitive's right to present evidence at the hearing on extradition is severely limited. He or she may only present evidence that explains rather than contradicts the demanding country's proof. *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978); *see also Cheng Na–Yuet v. Hueston*, 734 F.Supp. 988, 995 (S.D.Fla.1990), *aff'd*, 932 F.2d 977 (11th Cir.1991). The extent to which a fugitive may offer explanatory proof is largely within the discretion of the court. *Id.* at 1369. The finding of probable cause is specifically required by legislation in 18 U.S.C. § 3184. If no evidence of probable cause exists, then the requirement has not been met and the requesting state's allegations are nothing more than suspicions, and the request must be denied.

 The only evidence submitted by the Government in support of its petition for extradition is the March 1992 affidavit by Arce [7] and the summary of the proceedings before the Bolivian judge including the judge's findings and sentencing of Defendants. The Court then must determine if the affidavit and the record from Bolivia support a finding that Regina and Ramiro were part of a scheme to defraud Arce with the requisite criminal intent. A review of the affidavit of Arce reveals that it contains a variety of "conclusory" and speculative statements. Probable cause is not established merely by the fact that there has been an in absentia conviction. Rather, in those cases, the court "must scrutinize the evidence carefully to determine at least a reasonable probability that the petitioner is guilty of the crime." *United States ex rel. Argento v. Jacobs*, 176 F.Supp. 877, 883 (N.D.Ohio 1959); *see also In re Mylonas*, 187 F.Supp. at 720 (refusing to find probable cause to extradite the relator to Greece where there were contradictions and changes of position within the trial testimony). An extradition hearing is not conducted under the Federal Rules of Criminal Procedure and generally is not considered a criminal proceeding. *Castro Bobadilla v. Reno*, 826 F.Supp. at 1433.

## 1. The Government Has Failed To Show Probable Cause To Believe That Regina Has Committed The Crimes For Which She Was Convicted In Absentia In Bolivia.

Although the allegations contained in the extradition papers are rather extensive with respect to the entire Fernandez family, the allegations relating to Ramiro and Regina are extremely limited.[8] The fol-

---

7. Where a request for extradition is supported by an affidavit, recital of sufficient underlying facts is necessary if a magistrate judge is going to perform his judicial functions and not act merely as a rubber stamp. *In re Lehming*, 951 F.Supp. at 517, citing *Welling-*

*ton v. State of S. Dakota*, 413 F.Supp. 151, 154 (D.S.D.1976).

8. Indeed, given the exceedingly meager allegations made against Regina, one is left to wonder if Regina was included in the complaint solely so as to permit accusations of an

lowing are the allegations and evidence against Regina as stated in the Government's Complaint:

> Likewise, the Fernandez' sister, Regina Fernandez Moris, operated in Bolivia in representation of her brother as sales manager for the mentioned raw materials not being part of the partnership. Regina Fernandez Moris caused the disappearance of the documentation belonging to the company, obtaining before fleeing the country profits in the amount of $138,192.20 [sic], as well as a telefax, one computer, a word processor and other working materials.

> In addition, Regina Fernandez Moris, filled out and signed directly the remittance invoices for wood assigned to EAC Timber Americas, even though she was not an authorized executive of the company, much less a staff member. The original and copies of said invoices were taken with her. However the staff members of EMADEX SRL ... witnessed the above mentioned actions and they presented testimony to the court.

(Complaint at 5).

██ Arce admits in his affidavit that he has no personal knowledge of Regina's activities and that at most she signed two invoices and took copies of those invoices with her when she left. the country. No one witnessed this act of taking the documents, and more importantly, taking copies of documents hardly meets the requirements of any of the three crimes of which she has been convicted. Moreover, there has been no showing that Regina had the requisite criminal intent, and indeed, it is more likely that the documentation was taken as the result of clerical error, given her relative lack of experience with the company. While such conduct may violate office procedures, it certainly is insufficient to substantiate claims of criminal fraud.

Moreover, with respect to the charge of illegal association, Arce's own statements contradict such a finding. Regina suppos-

edly acted as a sales manager on her trip to Bolivia. According to Arce, she was "not part of the partnership nor was she an authorized executive of the company." No evidence supports any finding of criminal intent to participate in an alleged association given these deficient allegations and offers of proof.

In addition, as to the claim that Regina stole office equipment, Urquidi testified that the equipment was gone after she left, but there is no evidence to indicate that she was not authorized to take the equipment or that it belonged to Arce or any other individual who would have standing to complain about its status. Urquidi, the accounting assistant, stated that he was "aware that two invoices were collected by Regina Fernandez Moris and then on December 16, 1991 he reported to work as usual being very surprise [sic] when he so [sic] that the main working elements such as photocopier, telefax and others were not there any longer." Obviously, in order to establish probable cause to believe that a crime was committed, there must be some showing that Regina attempted to secure an unfair economic advantage by absconding with office equipment without permission. More specifically, there must be some showing regarding the ownership or entitlement to the equipment in order to establish that it was taken by illegal means. No such showing has been made.

Finally, the third accusation leveled at Regina states that she took funds equal to $138,192.27 from the joint account held by the partnership. First, the joint account required Arce's signature before any monies could be withdrawn, thus negating any claim of fraud. Second, even if Arce's signature were not required to access the funds in the account, this accusation is belied by the judge's own findings which indicate that the total amount of which Regina is accused of taking was actually paid to Ramiro, Roman and Ray over the course of time. "[I]n a regular manner they withdrew money adding up the

"illegal association" which requires the par- ticipation of four or more people.

amount of U.S. $138,192.27 American dollars withdrawn by [Roman, Ramiro and Ray]." Regina is not mentioned in the judge's findings in connection with that sum. Third, there is no documentary evidence to support an allegation that she absconded with those funds or that they were withdrawn during the time she was in Bolivia. The record evidence regarding that sum indicates that the last withdrawal occurred a month prior to Regina's arrival in Bolivia.

In summary, upon review of the Bolivian record and Arce's affidavit, even when considering the evidence as presented by Bolivia and ignoring any "contradictory evidence" as the Court must, the Court finds a lack of probable cause to find that Regina Fernandez Moris committed fraud, breach of trust or illegal association as defined by Bolivian law. *See Collins v. Loisel*, 259 U.S. at 315–17, 42 S.Ct. 469 (fugitive is not permitted to introduce conflicting evidence).

**2. The Government Has Failed to Show Probable Cause To Believe That Ramiro Manuel Fernandez Moris Has Committed The Crimes For Which He Was Convicted In Absentia In Bolivia.**

The allegations against Ramiro consist of accusing him of being an executive of EMADEX, INTERNATIONAL, INC., a company with name similar to that of the company owned by his sons and collecting payments for sales arranged by them.

At this time, the Fernandez Moris brothers incorporated a new company in Miami, Florida with a similar name to the company in Bolivia. They called the new company EMADEX INTERNATIONAL, INC. EMADEX INTERNATIONAL, INC. has no structural or commercial relationship with EMADEX SRL and was apparently created to confuse the purchasers and in that manner was able to receive some payments from the other companies which purchased the re-routed wood. The person in charge of obtaining those illegal collections was Ramiro Manuel Fernandez Moris, father of the Fernandez brothers. The money collected was deposited in banking account number 634–41 of Roman Reynaldo Fernandez Moris in the Banco de la Union S.A. in Bolivia.

(Complaint at 4).

Again, the paucity of these allegations is telling. There is no evidence to support a finding of probable cause with respect to Ramiro for fraud, breach of trust, or illegal association and nothing supports a finding of such criminal intent. Although Ramiro may have been the head executive of EMADEX INTERNATIONAL, INC., that fact alone is insufficient to establish probable cause with respect to the actions taken by his sons even if those were shown to be criminal. There is no evidence beyond mere speculation that Ramiro had any knowledge of his sons' actions or their supposed intent in creating the "new" company. Indeed, the Complaint acknowledges the speculative nature of the allegations regarding the reason the company was "apparently created."

Moreover, the affidavit of Arce explicitly states that the funds that were allegedly diverted were put into an account controlled by Roman, not Ramiro, further eroding the Government's position. The only "evidence" of Ramiro's benefitting from this alleged scheme is the mere fact of his paternal relationship to Roman. Familial relationships are clearly insufficient, in and of themselves, to establish probable cause. The Government, therefore, has failed to establish probable cause to believe that Ramiro, simply by virtue of his position with EMADEX INTERNATIONAL, INC., acted with the necessary intent to be convicted of fraud.

Likewise, nothing more than speculation supports the charge of illegal association which requires a showing on intent that is wholly absent here. According to the papers filed by the judge in the Bolivian proceeding, Ramiro's corporation, which

was allegedly set up to fool purchasers into paying EMADEX. INTERNATIONAL rather than the EMADEX/MAFICO entity, made illegal collections of unspecified amounts from unspecified sales and deposited by an unnamed person into an account in Bolivia. According to the allegations contained in the Complaint, the account in Bolivia was owned by Roman. Defendants contend that the account was actually jointly owned by Arce. In any event, the allegations of the Government are conclusory, unsupported by the evidence, and contain no evidence to suggest to the Court that Ramiro had the requisite criminal intent with respect to the crimes at issue. In addition, there has been no showing that he took the actions required to satisfy the elements of the crimes of which he is accused. Accordingly, the Court finds no probable cause, and thus extradition will be denied as to Ramiro. *See In re Lehming,* 951 F.Supp. at 515 (denying extradition where insufficient evidence to support conclusory language in supporting affidavit).

## C. The Government Has Failed To Establish Dual Criminality With Respect To The "Crimes" Allegedly Committed.

■ "Dual criminality refers to the characterization of the relator's criminal conduct insofar as it constitutes an offense under the laws of the respective states ... 'Double criminality' is in effect a reciprocity requirements which is intended too ensure each of the respective states that they (and the relator) can rely on corresponding treatment, and no state shall use its processes to surrender a person for conduct which it does not characterize as criminal." *United States v. Gallo–Chamorro,* 48 F.3d 502, 507 (11th Cir.1995) (quoting *United States v. Herbage,* 850 F.2d 1463, 1465 (11th Cir.1988) (quoting M. Bassiouni, International Extradition: United States Law and Practice vol. 1, ch. 7, sec. 3, 324–25 (2d rev. ed. Nov.1987))), *cert. denied,* 516 U.S. 811, 116 S.Ct. 59, 133 L.Ed.2d 22 (1995). The act charged must constitute a

crime in both Bolivia and the United States. *Factor,* 290 U.S. at 298–300, 54 S.Ct. 191; *Collins,* 259 U.S. at 311, 42 S.Ct. 469; *Polo v. Horgan,* 828 F.Supp. 961, 963 (S.D.Fla.1993). Even if the Government had established probable cause, there is insufficient evidence to indicate criminal activity by Defendants as opposed to some sort of potential civil liability. To prove criminal fraud, there must be a specific intent to defraud. *U.S. v. Brown,* 79 F.3d 1550, 1556 (11th Cir.1996).

■ In assessing the argument that there is a lack of dual criminality, the court relied heavily on the Affidavit of Bolivian Law Expert, Dr. Omar Barrientos Chavez. This expert, whom the Court finds to be qualified to offer testimony and evidence to the Court on issues of Bolivian law, pursuant to Fed.R.Civ.P. 44.1, concludes that the charges at issue here are really a matter of a civil claim rather than a criminal proceeding particularly given the business relationship that admittedly existed between Arce and the Fernandez brothers. Barrientos Aff. ¶ 7. In addition, Bolivian law requires that a claimant first file a civil case before proceeding with criminal charges in these circumstances. Barrientos Aff. ¶ 7. No such case was filed in this action. Barrientos Aff. ¶ 8. Under these circumstances, the charges should have remained a matter for the civil court. Barrientos Aff. ¶ 10. Moreover, counsel for Arce indicated that the criminal charges would be dismissed if the matter were resolved with the payment of a monetary settlement. Barrientos Aff. ¶ 12. This offer to dismiss "criminal" charges, on which Defendants have already been convicted in absentia, in exchange for a monetary payment smacks of a civil rather than a criminal proceeding.

Significantly, in this country, certain unethical business conduct does not rise to the level of criminally fraudulent behavior. *See United States v. Brown,* 79 F.3d at 1562 (declining to criminalize sharp business practices or unethical transactions in

business dealings); *see also United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980) (fraud statute does not come into play in every breach of contract action or where business expectations are not fulfilled); *United States v. D'Amato*, 39 F.3d 1249, 1261 n. 8 (2d Cir.1994) (breach of contract does not amount to mail fraud). There must be a plan to deceive in order to establish fraud. *Kreimer*, 609 F.2d at 128.

The facts outlined above and even as presented to the Bolivian court demonstrates that the cause of action arises from a business relationship and indicate that there in no evidence of a scheme to defraud on the part of Ramiro and Regina. To the extent that Arce suffered any damages as the result of any actions by the Fernandezes, his remedy, if any, is in civil court. As the court notes in its findings, the parties agreed to work together to reach a common goal and even shared a bank account during the course of this endeavor. Given these facts, the Court declines to find dual criminality, particularly where it appears that a condition precedent to criminality in Bolivia is the filing of a civil case which was indisputably never completed.

### D. The Complete Lack Of Due Process Accorded To These Defendants Shocks The Conscience And Is Antipathetic To The Court's Sense Of Decency.

▇ The Supreme Court has held that where extradition is sought pursuant to a valid treaty, a petitioner cannot prevent extradition simply by alleging that the criminal process he will receive in the foreign country fails to accord with constitutional guarantees. *See Neely v. Henkel*, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901); *Holmes v. Laird*, 459 F.2d 1211 (D.C.Cir.1972), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972). Called the rule of non-inquiry, this doctrine is derived from two important principles that: 1) extradition is essentially an

executive function given that it arises from the power to conduct foreign affairs and 2) out of respect for other countries' judicial systems. Allison Martson, *Innocents Abroad: An Analysis of the Constitutionality of the International Extradition Statute*, 33 Stan. J. Int'l L. 343, 366 (1997). In general, the rule of non-inquiry requires that a court not address arguments related to humanitarian considerations or conditions of another country's legal system and that those arguments or concerns are most appropriately addressed by the Department of State. *In re Singh*, 123 F.R.D. 127, 131 (D.N.J.1987). The Department of State has the discretion to deny extradition on humanitarian grounds, if it should appear that it would be unsafe to surrender a person to foreign authorities. *Id.* citing *Sindona*, 450 F.Supp. at 694.

▇ Proceedings in foreign countries are not to be tested by the safeguards established in the United States under its Constitution because those safeguards have "no relation to crimes committed without the jurisdiction of the United States against the law of a foreign country." *Neely*, 180 U.S. at 123, 21 S.Ct. 302. Minimal safeguards, however, are necessary to ensure fair trial in foreign court. *Id.* (Foreign trial must be without discrimination against accused because of American citizenship). The Supreme Court has provided for at least minimal safeguards to ensure a fair trial, and numerous courts have suggested that they would consider such other exceptional constitutional limitations as may exist because of particularly atrocious procedures or punishments employed by the foreign jurisdiction when addressing a habeas corpus petition. *In re Burt*, 737 F.2d 1477, 1487 (7th Cir.1984) (district court correct to address the merits of petitioner's due process claims as a part of its habeas corpus review); *see also Rosado v. Civiletti*, 621 F.2d at 1197–98 (petitioner cannot be denied all access to a federal court where foreign conviction was obtained without the benefit of any due process whatsoever); *Gallina v. Fraser*,

278 F.2d 77, 79 (2d Cir.1960) (closer scrutiny may be required where petitioner demonstrates that extradition would expose him to procedures or punishments that are antipathetic to the federal court's sense of decency), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960); *but see Escobedo v. United States,* 623 F.2d 1098 (5th Cir.) (binding precedent holding that humanitarian issues are within the exclusive purview of Executive Branch [9] where petitioner claimed that he might be tortured or killed if surrendered to Mexico), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980).

The rule of non-inquiry, however, is not inviolate and was first questioned in *Gallina*:

> The authority that does exist points clearly to the proposition that the conditions under which a fugitive is to be surrendered to a foreign country are to be determined solely by the non-judicial branches of the Government. The right of international extradition is solely the creature of treaty, *Factor v. Laubenheimer,* 290 U.S. 276, 287, 54 S.Ct. 191, 78 L.Ed. 315 (1933). Hence, if the extradition treaty so provides, the United States may surrender a fugitive to be prosecuted for acts which are not crimes within the United States, *id.* at 300, 54 S.Ct. 191. We regard as significant that the procedures which will occur in the demanding country subsequent to the extradition were not listed as a matter of a federal court's consideration in *Ornelas v. Ruiz,* 161 U.S. 502, 508, 16 S.Ct. 689, 40 L.Ed. 787 (1896); and we regard it as equally significant that, in refusing to enjoin the Secretary of Defense from turning over an American soldier for prosecution in Japanese courts on charges of having committed crimes on Japanese soil, the Supreme

Court gave no consideration to the procedures that would prevail in the Japanese courts, *Wilson v. Girard,* 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957). We note that in the field of interstate extradition it would appear that power to impose conditions under which a fugitive is to be surrendered lies in the hands of the Governor of the asylum state; [citations omitted]. Nevertheless, we confess some disquiet at this result. We can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of the principle set out above. This is not such a case. There were two convictions in absentia. In one relator was, apparently, represented by counsel. In the other relator was tried along with his alleged associates who were present before the court and who were also convicted. We affirm the determination of Judge Smith that the conditions under which relator is to be surrendered to Italy must remain in the hands of the State Department.

*Gallina,* 278 F.2d at 79 (emphasis added). The *Gallina* dictum has been cited favorably, but never applied, by a number of courts. *See Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir. 1983) (denying habeas corpus where Iceland had excellent human rights record and petitioner's affidavit regarding potential maltreatment was unsubstantiated); *United States ex rel. Bloomfield v. Gengler,* 507 F.2d 925, 928–29 (2d Cir.1974)(inability to raise a defense may be situation where the court must re-examine the principle of non-inquiry); *In re Sindona,* 450 F.Supp. at 694–95 (petitioner failed to demonstrate conditions so violative of human rights so as to prevent extradition);

---

**9.** The Court cannot help but note that since 1940, the Secretary of State has refused to surrender legally extraditable persons only four times. Martson, *supra,* at 367 citing *In re Lang,* 905 F.Supp. 1385, 1398 (C.D.Cal. 1995). The State Department obviously has its own legitimate interest in maintaining amicable relationships with countries from whom it also seeks extradition. *Id.* Accordingly, it cannot be expected to perform the judicial function in which an individual's due process rights are of paramount concern.

*Prushinowski v. Samples,* 734 F.2d 1016, 1019 (4th Cir.1984) (doctrine of non-inquiry cannot be taken to extremes). The circumstances in this case merit discussion in light of *Gallina.*

■■■ The lack of process afforded Defendants in this case is shocking to this Court. Defendants were given "notice" of these criminal charges by the placing of a notice in a Bolivian newspaper when it at the very least, was known that the Defendants were from North America. Pursuant to perjured testimony, that "notice" was provided in a country in which they did not live and, of which they were not citizens.[10] Moreover, the notice violated even Bolivia's own rules of procedure about giving notice to non-resident defendants. Barrientos Aff. ¶ 15. Although extraditees may not be entitled to all the protections that they would be afforded in American courts, they are still entitled to the protections of the country in which they are to be tried. *Martin v. Warden, Atlanta Penitentiary,* 993 F.2d 824, 830 & n. 10 (11th Cir.1993) (although humanitarian considerations are a matter for the state department, extraditee is entitled to the procedural protections provided by foreign law). Such protections have clearly been denied in this instance.

The trial was no less a travesty. All four defendants were "represented" by the same lawyer who offered no evidence on their behalf, cross-examined no witnesses, conducted no discovery, undertook no investigation, made no attempt to contact his clients, and made no arguments on their behalf. Barrientos Aff. ¶¶ 19–25. In addition, their attorney did not raise any arguments regarding the obvious procedural defects in providing notice to Defendants and the fact that no civil action was pursued prior to this criminal action being instituted. Barrientos Aff. ¶¶ 8–9, 21. Under Bolivian law, before penal sanctions can be sought with respect to Article 132,

335, and 346, the complainant must first pursue his remedies under the civil code, Article 1466. Barrientos Aff. ¶ 7. Moreover, he waived their right to appeal their conviction. Barrientos Aff. ¶ 25. Bolivian Attorney Barrientos opines that such a performance is considerably below that which is expected of a party's representative.

The Court finds that this case is somewhat akin to *Rosado,* 621 F.2d 1179, where the petitioners were arrested, tried and convicted in Mexico for narcotics violations and then were transferred to the United States to serve their sentences. *Id.* at 1182. The prisoners challenged their detention in a United States jail claiming that they had been denied due process in Mexico. *Id.* at 1182–83. Specifically, they were not given the assistance of counsel; they did not appear before the judge who tried their case; they could not address the charges that they faced; they were not permitted to confront their accusers or the witnesses; the legal secretary demanded bribes; and they were repeatedly tortured with electric currents while in jail. *Rosado,* 621 F.2d at 1198–1200. The *Rosado* court stated:

> In reaching this conclusion [that the Court could address the due process concerns], we by no means imply that each element of due process as known to American criminal law must be present in a foreign criminal proceeding before Congress may give a conviction rendered by a foreign tribunal binding effect. Indeed, we are keenly sensitive to the historical and cultural limitations of our constitutional heritage, and respect the similarly indigenous underpinnings of the process accorded criminal defendants abroad.

621 F.2d at 1197–98. The Court concluded that they could test their continued confinement on the basis of these deprivations of due process although their peti-

---

**10.** It is clear that Arce knew the whereabouts of Defendants given that he was pursuing a suit in South Carolina against them and had served both Defendants with notices of deposition in January 1992.

tions were eventually denied as they had waived their rights to appeal their Mexican convictions. *Id.* at 1189. *See also Esposito v. Adams,* 700 F.Supp. 1470, 1481 (N.D.Ill.1988) (denying habeas corpus where Italian proceedings did not lack barest rudiments of due process where trial conducted in absentia included the cross-examination of witnesses, discovery, and petitioner had right to appeal his conviction); *In re ex rel. Bloomfield,* 507 F.2d at 928 (noting that there may be situations where an extraditing country and its court will inquire into the legal proceedings which await the relator upon extradition). Likewise, these Defendants did not receive even the barest rudiments of due process calculated to arrive at the truth with respect to the allegations presented against them.

Given the complete lack of notice, lack of representation, the conviction in absentia, the waived right of appeal, the court's apparent disregard for its own procedures and substantive law, and the unquestioning acceptance of obviously perjured testimony, this Court casts a skeptical eye on the evidence presented by the Government in this case. Given that skepticism, this Court has already found that the Government failed to show probable cause and dual criminality. Thus, this Court need not address whether this case and the egregious set of facts this it presents is the sort that the *Gallina* court had in mind when it speculated that there may one day be a case that so shocks the court's conscience and sense of decency that extradition is denied on that basis alone.[11] *See Prushinowski v. Samples,* 734 F.2d at 1019 (extradition may be barred, for example, where prisoners are subject to a hundred lashes a day if they do not deny their God); *see also In re Burt,* 737 F.2d at 1487 (extradition challenge may be founded on particularly atrocious procedures employed by the foreign jurisdiction).

---

11. Accordingly, the Court need not address whether *Escobedo* precludes this Court's adoption of the *Gallina* exception for lack of due process as opposed to humanitarian rea-

### CONCLUSION

The Court finds that a lack of probable cause exists to believe that Ramiro and Regina Fernandez Moris committed the crimes of which they are accused. Moreover, the Court's finds a lack of dual criminality. Thus, this Court will NOT issue a Certificate of Extradition to the Secretary of State recommending that Ramiro and Regina Fernandez be extradited to Bolivia.

sons. *See also Martin,* 993 F.2d at 830 n. 10 (this circuit has "never embraced the *Gallina* dictum").